[No. A108894. First Dist., Div. Two. Oct. 18, 2005.]

In re GEORGE SCOTT on Habeas Corpus.

COUNSEL

George Scott, in pro. per.; and Michael Satris, under appointment by the Court of Appeal, for Petitioner.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Frances T. Grunder, Assistant Attorney General, Anya M. Binsacca and Brian G. Walsh, Deputy Attorneys General, for Respondent.

OPINION

KLINE, P. J.—George Scott was convicted of second degree murder in 1986 and sentenced to an indeterminate prison term of 15 years to life plus two years for use of a firearm. He has been incarcerated in state prison for 18 years.

In 2003, after repeated denials of parole by the Board of Prison Terms (Board), Scott filed a petition for writ of habeas corpus in this court. We granted the petition. (*In re Scott* (2004) 119 Cal.App.4th 871, 876–877 [15 Cal.Rptr.3d 32] (*Scott I*).) Finding that the Board's 2001 determination Scott was unsuitable for release on parole unsupported by any evidence, and that the Board failed to consider substantial evidence showing Scott was suitable for release (*id.* at pp. 889–899), we ordered the Board to conduct a new parole suitability hearing to "consider evidence of all relevant circumstances identified in its own regulations as tending to show a prisoner suitable for release from prison" (*id.* at p. 899).

On July 20, 2004, a panel of the Board found Scott suitable for parole and set a parole release date. The Governor reviewed the Board's decision (Pen. Code, § 3041.2) and, finding Scott would pose an unreasonable risk of danger to society if released, reversed it on December 14, 2004. Petitioner filed a petition for writ of habeas corpus in this court on January 14, 2005. We issued an order to show cause. The issue presented is whether the Governor's decision is supported by "some evidence." (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 626 [128 Cal.Rptr.2d 104, 59 P.3d 174] (*Rosenkrantz*).)

We shall conclude that the Governor failed to consider "specified factors" required to be considered in determining a prisoner's suitability for release, denying Scott his right to an individualized consideration of all pertinent criteria, and that the criteria he relied upon are not supported by "some

evidence." Accordingly, we shall vacate the Governor's decision, grant Scott's petition for writ of habeas corpus, and direct the Board to release Scott on the conditions it previously imposed.

## BACKGROUND

With minor exceptions we later identify and discuss, the evidence considered by the Board and Governor in 2004 is substantially the same as that before the Board in 2001. We therefore rely heavily on the description of that evidence set forth in our opinion in *Scott I, supra,* 119 Cal.App.4th 871.

1. *The Commitment Offense*

"During the spring and summer of 1986, Scott noticed several dramatic changes in his wife's demeanor and behavior, such as inattention to duties at home and at work, loss of weight, and uncharacteristically erratic conduct. Scott eventually discovered she had become addicted to cocaine and amphetamines and was having an affair with her drug dealer, Douglas Bradford. Scott reported Bradford's illegal activities to the police, but they refused to respond. When Bradford learned of Scott's attempts to involve the police, he told Scott he would 'do him in' if he did not cease these efforts. Following a series of ineffectual attempts to deal with his wife's addiction and several confrontations with Bradford, including one in which Bradford displayed a firearm, Scott became increasingly distressed and concerned for his personal safety. Due to his fear of Bradford, Scott moved out of the family residence into a mobilehome.

"On July 4, 1986, Scott's wife visited him at the mobilehome to remorsefully confide her intention to stop using drugs and end her relationship with Bradford. At some point, she said she was not feeling well and needed to go home to take medication but would return to stay the night with Scott. When she failed to return, Scott suspected she had gone to Bradford's residence and went there to find her. When he arrived, he saw Bradford, Scott's wife, and Scott's 13-year-old son watching fireworks in front of the house with others. Bradford and Scott's wife were affectionately 'hugging' one another. At that point, according to witnesses, Scott approached with a .22-caliber handgun, Bradford pushed Scott's wife out of the way and confronted Scott. As Bradford moved toward him, Scott told him, 'Get away. I'm going to shoot you.' After firing two or three rounds, which struck Bradford in the head and thigh, Scott left the scene.

"Police officers dispatched to the scene found Bradford lying face-up in the street, still alive. Scott's wife told the officers, 'Scotty shot him.' At the request of the officers, Scott's son called his father's pager number. Scott called back and spoke with a police officer. Crying, and with a shaking voice, he told the officer, 'I really blew it.' Paramedics transported Bradford to Peninsula Hospital, where he died seven days later. Three days after the shooting, Scott went to the sheriff's office to turn himself in.

"By a single count information filed on September 25, 1986, Scott was charged with first degree murder. Apparently in consideration of the possibility Scott might successfully claim self-defense, the district attorney offered Scott a plea bargain. In return for a plea of guilty to manslaughter, the district attorney agreed to support a nine-year sentence. Scott's attorney advised him to reject the offer, predicting his claim of self-defense would prevail and he would be acquitted at trial. Scott did not take the stand and called no witnesses.

"On December 29, 1986, a jury returned a verdict finding Scott guilty of first degree murder based on the felony-murder rule.[1] On December 31, 1986, after the jury was directed to continue to deliberate upon the remaining grounds on which murder was charged, it returned verdicts of 'not guilty of first degree murder based upon premeditation and deliberation,' and guilty of murder in the second degree based upon malice aforethought.

"At the sentencing hearing on November 6, 1987, Scott moved for a new trial on first degree murder. In response, the district attorney offered to stipulate to the relief Scott sought if he would enter a plea of guilty to second degree murder and waive his right to appeal. Scott accepted the offer." (*Scott I, supra,* 119 Cal.App.4th at pp. 878–880, fns. omitted.) The court found Scott " 'knowingly and intelligently entered into the stipulation, and waived his right to appeal' and granted Scott's motion for new trial 'as to the first degree felony murder conviction.' The court sentenced Scott to state

---

[1] As we noted in *Scott I*, the independent felony upon which the felony-murder rule was based was Scott's robbery of his wife's purse, which was lying on the hood of a car near where she was standing. The single count indictment did not charge Scott with robbery, but the prosecution could rely on the felony-murder rule without pleading an underlying felony, "so long as the elements of that offense are proved, as was apparently the case here." (*Scott I, supra,* 119 Cal.App.4th at pp. 879–880, fn. 4.) At many of his parole hearings, Scott told the Board that he took the purse because he wanted to bring it to the police. As he explained at the 1999 hearing, "[i]n the past, I had found drugs in her purse and we argued over that and this was my attempt to seize her purse, run to the Police Department, which was only about a block away around the corner, dump it out on the counter and say, will you please now help me, do something for my wife?"

prison for 15 years to life, the base term for murder in the second degree. (Pen. Code, § 190.) Exercising its discretion not to strike additional punishment for personal use of a firearm (Pen. Code, § 12022.5), the court also imposed an additional and consecutive term of two years for the use of a firearm." (*Scott I,* at p. 880.)

Chief Deputy District Attorney Steve Wagstaffe testified at the 2004 Board hearing that the reason the prosecution offered a plea to second degree murder was to induce Scott "to waive all claims of incompetence of counsel of the first attorney." The prosecutorial concern that Scott, whose self-defense claim was presented to the jury without benefit of the testimony of a single witness, may have received ineffective assistance of counsel appears to have been justified. As we noted in *Scott I,* "Scott successfully sued his original defense counsel for breach of contract and used the damages he received (reimbursement of the funds he paid the attorney [$99,274.79 plus interest]) 'to pay off a wrongful death action that had been initiated by the victim's family.' " (*Scott I, supra,* 119 Cal.App.4th at p. 879, fn. 3.) The trial judge who decided Scott's civil suit found that although he could not show malpractice, Scott was entitled to damages for breach of contract because he did not receive "legal representation equal in quality to that commonly provided by competent criminal attorneys who try murder cases in [San Mateo] county" and instead received "substandard legal service."

## 2. *Scott's Background*

"Scott was born in San Francisco on September 23, 1940, to an intact family. His mother died shortly after childbirth and he and his father resided with his maternal grandparents until he was nine, at which time his father remarried. Three additional children were born of that union. The family atmosphere was healthy and free of lawbreaking, mental illness, or substance abuse. Scott dropped out of high school in his senior year to join the Navy. He served four years, until the age of 21, and received an honorable discharge. While in the Navy, he earned a GED and learned several machinery-related trades. Scott married in 1962, a year after he was discharged, and the marriage, which remained intact until 1993, produced three sons and a daughter. Scott now has nine grandchildren [11 at the time of the 2004 hearing].

"Upon leaving the service, Scott was employed by a soft drink company and remained there until the instant offense, eventually becoming a part-owner. He and his wife also purchased a delicatessen in San Francisco, which

was successful until others began using it as a venue for drug dealing and Scott's wife began taking money from the business in order to pay her drug supplier." (*Scott I, supra*, 119 Cal.App.4th at p. 880.)

Except for the present offense, two misdemeanor convictions (for reckless driving and vandalism) arising out of altercations with Bradford and his wife shortly before the crime (described, *post*, at pp. 588–589), and minor Vehicle Code violations when he was a juvenile, Scott has no criminal record.

### 3. *Scott's Conduct While Incarcerated*

Scott's in-prison conduct, which has been uniform during the entire period of his incarceration, is also set forth in our prior opinion: "According to an evaluation prepared by the Department of Corrections, Scott 'has been an extremely valuable worker in the prison heating and cooling services' whose 'file includes literally pages of laudatory chronos.' The report concurred with an earlier evaluation of Scott, which approvingly describes him as a 'workaholic.'

"In tests given in prison, Scott earned 'maximum scores in both major academic areas,' and his '[n]ative intelligence is at the very least average.' He has exhibited no tendencies to sexually aberrant behavior, has never used drugs, drank only moderately prior to confinement, and has no medical or psychiatric problems. Scott remains in touch with all members of his immediate family, including his former wife. The evaluation states that Scott 'seems to be on top of his trade and should be promptly employable on release.' When released from prison, Scott plans to join up with his youngest son, who works in the refrigeration field in which Scott is skilled. Another son has offered to provide housing until Scott is financially secure." (*Scott I, supra*, 119 Cal.App.4th at p. 881.) The Board received nearly two dozen reports, known as "chronos," from individual correctional officers familiar with Scott, all of which lauded his conduct and attitude.

### 4. *Psychological Evaluations of Scott*

Three of the four psychological evaluations of Scott considered in 2004 by the Board and the Governor are described in *Scott I*. "Dr. Dean J. Clair, a psychologist who evaluated Scott in 2001, believed that 'the key background element' in evaluating Scott 'appears to be a marriage which was disintegrating behind the addictiveness and infidelity of [his] wife.' He 'has a life totally free of violence apart from the era in which his marriage was falling apart.

He has no writeups—serious or otherwise—after spending thirteen years in an environment in which it is quite easy to get written up purely by accident. [¶] Mr. Scott has had a long and active participation in . . . self-help programs such as Breaking Barriers and Men's Violence Prevention. Exit comments note that he has developed insights into the breakdown of controls, which led to his commitment offense. [¶] It is only half in jest that I estimate that Mr. Scott, if released, would pose no greater or less a threat to the public order than would the writer himself.'

"Dr. Clair's evaluation notes that when, in 1999, the Board denied Scott parole for two years, it did not mention the 'thorough and painstaking' report prepared that year by another psychologist, Dr. Stephen J. Donoviel. Suggesting that Dr. Donoviel's report 'may not have been available' when the Board denied parole in 1999, the 2001 report indicates that it is simply a summary and 'update' of the earlier report. Dr. Donoviel's detailed report emphasized not only the authenticity of Scott's remorse and the 'considerable insight' he gained from prison programs, but the uncharacteristic nature of his criminal act and the extenuating circumstances that led to it: 'for the first 23 to 24 years of their relationship, [Scott and his wife] were a relatively healthy and happy middle to upper-middle class family who worked hard and enjoyed the benefits of their labors. Although both parents worked hard and long hours, it appears that it was not until his wife became addicted to methamphetamines and cocaine and subsequently had an affair with her dealer that their marriage fell apart.' The report continued: 'While it is evident from [Scott's] description and the record that he was under considerable pressure and experiencing extreme distress several months prior to the instant event in his attempts to deal with his wife's cocaine and amphetamine addiction and subsequent deterioration and probably was suffering from a diagnosable adjustment disorder at that time, I find no evidence to warrant a diagnosis on either Axis I or Axis II at the present time. It appears that Mr. Scott is and has been dealing with the rigors of prison life as well as anyone could be expected to do and from all reports he performs his work in an exemplary fashion and interacts with all those he is in contact with in a respectful and appropriate manner.'

"Dr. Donoviel's evaluation concluded with the following observations: 'As noted above, there has been no indication of aggressive or violent behavior since his incarceration and there were no indications for any such behavior in the first 45 years of his life. In view of the lack of problematic behavior in this institution[al] setting and given his history prior to the circumstances surrounding the instant event, it is my opinion that he presents a less than average risk of future violence if released to the community. He clearly is

capable of following rules and expectations and would in my opinion be extremely compliant with any conditions of parole. In view of his work history prior to incarceration and since being institutionalize[d], he has various skills that would lend themselves to ready employment.' Dr. Donoviel concluded that Scott 'offers positive prognosis for living in the community,' noting that Scott has 'supportive relationships with family and friends,' as well as 'discipline free years of incarceration, exemplary work record both since his institutionalization and prior to that time, viable opportunities for gainful employment and a prosocial crime free history until the instant offense.' " (*Scott I, supra*, 119 Cal.App.4th at pp. 881–882.)

The only psychological evaluation of Scott considered at the 2004 hearing not previously before the Board was the April 23, 2004 report of Nancy Van Couvering, Ph.D., a forensic psychologist. Her lengthy report, fully consistent with those prepared by Drs. Clair and Donoviel, concludes as follows: "The inmate's performance [in prison] has been exemplary. He has received no disciplinary actions and has received many laudatory chronos. He has used his time productively. He has rebounded from the violence seen in the crime and resumed a lifestyle that seems very similar to the one prior to the crime. The crime was a product of prolonged, cumulative stress of an unusual type. After a 24-year relatively uneventful marriage, his wife's behavior suddenly deviated to addiction, deceit and betrayal. He was unprepared for this, but may have missed earlier warning signs. In any event, it was an unusual combination of stressors that seemed unlikely to happen again. At this point, the risk of future violence in the community is low."

The conclusions of Drs. Clair, Donoviel, and Van Couvering—that Scott presents a low risk of future violence—were previously expressed in a 1996 psychological evaluation of Scott by Dr. R. Horon, a staff psychologist employed by the Department of Corrections, and concurred in by the Chief Medical Officer, Chief Psychiatrist, and Senior Psychologist of the California State Prison at Solano, at which Scott was then confined. So, too, was this the view expressed in a life prisoner evaluation report prepared by the Department of Corrections, which concluded that the fact that Scott committed the crime "during a brief period of extreme mental or emotional trauma" is a significant mitigating factor indicating he "would pose a low degree of threat to the public at this time if released from prison."

The Board also received reports from leaders of five self-help and spiritual programs Scott actively participated in while in prison. All described the positive nature of his participation, his acceptance of personal responsibility for his crime, and his appreciation of its negative impact not just on his victim but as well the victim's family and friends and the community at large.

The Board received letters recommending parole from Scott's children, many of his grandchildren, and several former business associates. Scott also submitted a written offer of a job as an account manager at a software company with a starting salary of $35,000. Scott's wife, whose drug use ended about three years after his conviction, and from whom he is now divorced, sent the Board a six-page letter stating reasons she felt he was deserving of parole and acknowledging her responsibility for the events that led to his crime.[2]

The Board reviewed letters opposing parole from the victim's daughter and brother, the husband of the victim's deceased sister, and the victim's ex-wife. A short letter opposing parole was also received from the Chief of Police of the City of San Bruno, who maintained Scott "is a danger to the public," and "[t]here is no amount of time [he] can serve that would repay for the willful and deliberate taking of Mr. Bradford's life."

Chief Deputy District Attorney Steve Wagstaffe urged the Board to deny parole. Wagstaffe claimed Scott's conduct was "not this noble thing of just trying to save the wife," but the result of "anger toward . . . Mr. Bradford and her" that Scott refuses "to talk to you about." He also maintained that Scott minimizes the significance of the domestic violence he engaged in during confrontations with his wife prior to the killing of Bradford, which was violent and included "stalking."[3] The argument to which Wagstaffe devoted the greatest time, however, challenged one of the reasons given in *Scott I* for finding Scott's offense was not committed " 'in a dispassionate and calculated manner, such as an execution-style murder.' " (*Scott I, supra,* 119 Cal.App.4th at pp. 890–891.) Wagstaffe argued that though the district attorney offered Scott a pretrial plea to manslaughter (which does not require premeditation), the jury found Scott not guilty of first degree murder on the

---

[2] In this regard, the wife states in her letter that during the winter of 1985–1986 she was "under enormous stress" due to family and business pressures and because her mother, brother and sister were then "all dying prolonged and painful deaths." Because Scott was "busy with multiple jobs" during this crisis, she "began to talk with a man who came into the deli" and "offered a sympathetic ear" and, later, methamphetamine. She quickly became "hooked," ignored her responsibilities to the business and family, and "became sexually involved with the man who supplied the drugs." The letter acknowledges "that my behavior really provoked George, put enormous pressure on him, and pushed all his buttons. George was absolutely crazed and enraged by my behavior." He was not only "upset" by the problems in the home and the business, but "astonished that I was using drugs and involved with a 'biker,' and he just didn't know how to deal with it at all. We separated, after being together almost 28 years, but instead of making things easier, it just accelerated his depression and rage." Scott was unable to sleep "for days on end" contacting her with demands that that she "stop using drugs" and "return to the family." Scott's wife also states in her letter that Scott felt afraid of Bradford "who was much larger and tougher than George was."

[3] This charge apparently refers to conduct alleged in the district attorney's complaint seeking to hold Scott in contempt for violating his wife's restraining order. Wagstaffe did not mention that a jury acquitted Scott of committing such conduct.

basis of premeditation, and the district attorney agreed after trial to set aside Scott's conviction by the jury of first degree murder on the basis of the felony-murder rule if Scott would enter a plea to second degree murder (which also does not require premeditation), Scott's crime was nevertheless premeditated.[4] According to Wagstaffe, the pretrial offer "had nothing at all to do with . . . what we're talking about today," but only with "what we felt the evidence would be able to prove." The postconviction offer was also irrelevant to the issue of premeditation and the other issues before the Board, he maintained, because its only purpose was to induce Scott to waive any posttrial claim of ineffective assistance of counsel.

## 5. 2004 Parole Board Findings

On July 20, 2004, the Board found Scott suitable for parole, concluding he "would not pose an unreasonable risk of danger to society or a threat to public safety if released from prison." The presiding member of the Board panel observed that in reaching its decision, the panel considered that Scott had no juvenile record nor significant criminal history, an unusually stable social history, many years of responsible work as a business owner, a long-term marriage, four supportive children, no alcohol or drug abuse, "very positive institutional behavior which indicates significant improvement in self control" as well as "maturation, growth, [and] greater understanding." The Board felt recidivism unlikely also because of Scott's age, his full acceptance of responsibility for his criminal behavior and remorse, his "very realistic parole plans," the job offer he received, and the "tremendous support" he continues to receive from family and friends. The presiding officer read aloud from, and the panel evidently placed considerable weight on, Dr. Van Couvering's statement that Scott's crime was the product of extreme stress caused by an unusual combination of circumstances unlikely to recur. The Board agreed, stating that though the stress he was experiencing did not justify his conduct, Scott "did commit the crime as a result of significant stress in [his] life." The panel also felt "the victim's actions contributed to the motivation for the act resulting in the death," observing that Bradford "persisted in having a relationship with the prisoner's wife and was supplying her drugs" despite Scott's repeated attempts to get him to stop.

At the end of the hearing, the presiding officer emphasized three factors the panel considered particularly important: (1) "you did commit the crime as a result of significant stress in your life," (2) "you lack a significant criminal history of violent crime" even considering "the prior domestic abuse," and (3) the homicide "resulted at least partially from contributing factors from the

---

[4] We find it unnecessary to inquire whether Wagstaffe's argument violated the terms of the plea bargain (see *In re DeLuna* (2005) 126 Cal.App.4th 585, 598–599 [24 Cal.Rptr.3d 643]), as this claim was made for the first time by Scott at oral argument.

victim in that the victim persisted in having a relationship with the prisoner's wife and was supplying her drugs." In the view of the panel, "the victim's actions contributed to the motivation for the act resulting in the death." Primarily for these reasons, the panel concluded Scott "would not pose an unreasonable risk of danger to society or a threat to public safety if released from prison" and granted him a parole release date.

In calculating a parole release date, the Board assessed 228 months for the base offense. The presiding member explained that the panel aggravated the term because during the commission of the crime Scott could have but did not "back[] off" and endangered others at the scene. Granting postconviction credits of 66 months, the Board imposed a total period of confinement of 162 months, approximately 13 and one-half years, and set a parole release date of October 4, 2001, which, as the panel told Scott, means "you are past your release date." Noting that "there has been no alcohol use, no drug use, and you have not been a member of a gang or anything like that," the panel imposed only one special condition of parole: that Scott "report to a parole outpatient clinic for an evaluation . . . to make sure that you have all the tools necessary for your adjustment to a free society."

6. *The Governor's Decision*

The Governor found Scott unsuitable for parole on the basis of his determination the murder of Bradford was "especially atrocious" and "particularly heinous." According to the Governor, "[t]he gravity of the murder committed by Mr. Scott alone is a sufficient basis on which to conclude that his release from prison at this time would pose an unreasonable public safety risk."

In support of this determination, the Governor pointed to the facts that Scott fired at Bradford "approximately three times," Bradford was "incapacitated" when Scott fired the final shot, and the murder was committed in front of several witnesses. The factor the Governor appears to have found most significant was "evidence in the record before me [showing] that Mr. Scott premeditated at some level to kill Mr. Bradford." The evidence of premeditation the Governor identified consists of that emphasized by the district attorney at the 2004 parole hearing—a statement in the 1987 probation report that a witness saw Scott "hiding on a staircase at or near a school estimated to be at least a half-block away from Mr. Bradford's home"—and observations by the trial judge at the time of sentencing. After noting Scott was

statutorily ineligible for probation (Pen. Code, § 1203.06), the judge stated that even if Scott were eligible he would deny probation for numerous reasons, one of which was that Scott "planned the commission of the crime." In the course of denying Scott's motion to strike the imposition of an additional and consecutive term of two years for the use of a firearm (then allowed under Pen. Code, § 12022.5), the trial judge identified the evidence of planning he apparently had in mind. According to the court, a witness named George Davis testified that, during a conversation in a bar about a month before the killing, Scott "recited his difficulties with the victim, Mr. Bradford. The witness testified . . . that he told Mr. Scott that Mr. Bradford wouldn't put up with [Scott's objections to Bradford's relationship with his wife] and he wouldn't be pushed." According to the court, Davis testified that Scott "pulled, presumably, the murder weapon out of his pocket, and showed it to Mr. Davis and said that the weapon would protect him and take care of the victim."

The Governor felt the gravity of Scott's offense was aggravated because shortly before the crime Scott engaged in altercations with his wife and Bradford resulting in law enforcement interventions that should have deterred Scott from confronting and killing Bradford. The 2004 Board hearing probed deeply into these events. The relevant evidence consists of the probation report prepared at the time of trial and Scott's Board testimony. The first encounter took place less than five months before the homicide. Under questioning, Scott said he was trying to stop his wife from going "to do drugs and see Mr. Bradford." When she screamed at him because he had blocked her car, Scott reached into the car and hit her with the back of his hand, causing a bloody nose. Scott "felt really bad," helped her out of the car and into the house and then drove her to Kaiser Hospital, where his wife asked a security guard to call the police. The police felt they had no grounds upon which to arrest Scott and refused to detain him unless his wife made a citizen's arrest, which she did. The police then escorted Scott to county jail, where he was briefly detained, charged with battery and spousal abuse, and then released. Scott returned home to find his wife asleep; they argued some more and Scott then left. The charges against Scott were dismissed.

About two months later, Scott went looking for his wife after she disappeared from the house. He found her in a car with Bradford and followed them. When Bradford refused to pull over, Scott "started ramming the back of the car hoping he would pull over." The two cars picked up speed until a police car appeared, at which time Bradford pulled to the side of the road. Scott was arrested for reckless driving and for vandalism (evidently relating to damage caused by the reckless driving), convicted, and sentenced to 45 days in county jail.

The third incident occurred about two weeks later. Because Scott's wife thought he was "snooping around" on the roof of the family residence, she paged him and called the police. Scott said he was in Daly City when he received the page and that when he responded his wife began "screaming at me [to] get off of the roof of the house and quit bothering her." When he called her again in response to another page, a police officer answered and told Scott his call violated a restraining order.[5] The Governor's decision rests in part on the fact that Scott "was arrested . . . for violating Mrs. Scott's restraining order against him," but, like Wagstaffe at the parole hearing, does not mention Scott was found not guilty of disobeying the restraining order.

The Governor found that "the nexus" between the foregoing conduct and the slaying of Bradford "weighs against [Scott's] release to parole," as it shows "Scott was undeterred and unsuccessful at correcting his criminal conduct."

The Governor's decision concludes as follows: "While Mr. Scott's risk for recidivism is reduced now at the age of 64 and in light of his creditable gains in prison over the last 18 years, the standard by which I am governed is whether I believe Mr. Scott would pose an unreasonable risk of danger to society if released from prison at this time. And after carefully considering the very same factors the Board is required to consider, I do. Accordingly, because I find the gravity of the murder Mr. Scott committed, independently and particularly when coupled with his significant criminal history, outweighs the positive factors tending to support his release presently, I REVERSE the Board of Prison Terms' 2004 decision to grant parole to Mr. Scott."

On January 14, 2005, Scott filed a petition for writ of habeas corpus seeking review of the Governor's decision. On March 30, 2005, we issued an order to the Director of the Department of Corrections to show cause why the relief requested should not be granted, directed the First District Appellate Project to arrange for appointment of counsel for petitioner, and ordered the Attorney General to file a certified copy of the entire administrative record that was reviewed by the Governor. The Attorney General filed a return to the order to show cause on April 18, 2005, and petitioner filed a denial thereto on May 3, 2005.

---

[5] The restraining order at issue is presumably the type authorized by Code of Civil Procedure section 527.6, which may be obtained to protect a person against "harassment," i.e., "unlawful violence, a credible threat of violence, or a knowing and willful course of conduct directed to a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose."

## DISCUSSION

### I.

■ As we have said, the Governor's decision is subject to judicial review pursuant to the "some evidence" standard set forth in *Rosenkrantz, supra,* 29 Cal.4th 616. That is, we "inquire only whether some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation." (*Id.* at p. 658.)[6]

■ However, like the Board's parole decision, the Governor's independent decision whether to affirm modify, or reverse a parole decision of the Board, must satisfy the requirements of procedural due process under California law. (*Rosenkrantz, supra,* 29 Cal.4th at p. 660.) As *Rosenkrantz* states, "[a]rticle V, section 8(b), [of the California Constitution] provides that 'the Governor *may* review the [parole] decision *subject to procedures provided by statute.*' (Italics added.) This language confers upon a Governor the discretion whether to review a parole decision, but if such discretion is exercised, he or she is constrained by the procedures specified by statute. Article V, section 8(b), further states: 'The Governor may only affirm, modify, or reverse the decision of the parole authority *on the basis of the same factors which the parole authority is required to consider.*' " (*Rosenkrantz,* at p. 660, italics added by the *Rosenkrantz* court; see *In re Ramirez* (2001) 94 Cal.App.4th 549, 559–560 [114 Cal.Rptr.2d 381], disapproved on other grounds in *In re Dannenberg* (2005) 34 Cal.4th 1061, 1100 [23 Cal.Rptr.3d 417, 104 P.3d 783].) ■ "As with the discretion exercised by the Board in making its decision, the precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the Governor, but *the decision must reflect an individualized consideration of the specified criteria* and cannot be arbitrary or capricious. It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. *As long as the Governor's decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the Governor's*

---

[6] As noted in *Rosenkrantz, supra,* 29 Cal.4th at page 656, the "some evidence" test has its roots in *In re Powell* (1988) 45 Cal.3d 894 [248 Cal.Rptr. 431, 755 P.2d 881] and *Superintendent v. Hill* (1985) 472 U.S. 445 [86 L.Ed.2d 356, 105 S.Ct. 2768]. *Powell* held that, in rescinding a parole release date, the Board does not abuse its discretion "when it has some basis in fact for its decision" (*Powell,* at p. 904), and *Hill* required "some basis in fact" and "some evidence" to support a disciplinary board revocation of good time credits. (*Superintendent v. Hill,* at p. 456.) Therefore, as applied in *Rosenkrantz,* the "some evidence" test may be understood as meaning that suitability determinations must have some rational basis in fact.

*decision.*" (*Rosenkrantz,* at p. 677, italics added.) " 'Additionally, the evidence underlying the [parole authority's] decision must have some indicia of reliability.' " (*Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910, 915, quoting *Jancsek v. Oregon Bd. of Parole* (9th Cir. 1987) 833 F.2d 1389, 1390.)

## II.

■ The specified factors applicable to the Board's, and therefore also the Governor's, parole decisions are set forth in Penal Code section 3041 and Board regulations (promulgated pursuant to subdivision (a) of section 3041) establishing criteria for determining suitability for release on parole. (Cal. Code Regs., tit. 15, § 2402.)

■ The factor statutorily required to be considered, and the overarching consideration, is "public safety." As stated in subdivision (b) of Penal Code section 3041, the Board "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that *consideration of the public safety* requires a more lengthy period of incarceration for this individual . . . ." (Italics added.)

■ The factors required to be considered by Board regulations are for the most part specified in section 2402 of title 15 of the California Code of Regulations, which consists of four subdivisions. Subdivision (a), which reiterates the statutory factor, states that "[r]egardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison."

Subdivision (b) of section 2402, title 15 California Code of Regulations, provides that "[a]ll relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability."

■ California Code of Regulations, title 15, section 2602, subdivision (c) specifies six nonexclusive factors tending to show *unsuitability*, the relative importance of which "is left to the judgment of the panel." The specified factors are:

"(1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:

"(A) Multiple victims were attacked, injured or killed in the same or separate incidents.

"(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.

"(C) The victim was abused, defiled or mutilated during or after the offense.

"(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

"(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

"(2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

"(3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.

"(4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

"(5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.

"(6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail."

■ Subdivision (d) of section 2402 of California Code of Regulations, title 15, which is the converse of subdivision (c), specifies nine factors tending to show *suitability* for release, leaving the importance to be attached to any

circumstance or combination of circumstances in a particular case to the judgment of the panel. The specified factors are:

"(1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential or personal harm to victims.

"(2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.

"(3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeing help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

"(4) Motivation for Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time."

"(5) Battered Woman Syndrome. At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.

"(6) Lack of Criminal History. The prisoner lacks any significant history of violent crime.

"(7) Age. The prisoner's present age reduces the probability of recidivism.

"(8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

"(9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release."

## III.

The Governor's strong focus on the gravity of Scott's offense and his statement that that factor "alone is a sufficient basis on which to conclude that [Scott's] release from prison at this time would pose an unreasonable public-safety risk" suggests the Governor relied only on that factor. On the other hand, the Governor's statement that "the gravity of the murder

Mr. Scott committed, independently *and particularly when coupled with his significant criminal history*, outweighs the positive factors tending to support his release" leaves room to think Scott's criminal history may have been considered by the Governor not just in connection with the commitment offense but as an independent basis for his decision. The relative importance the Governor ascribed to Scott's commitment offense and his "significant criminal history" makes no difference, however, because, as we shall explain, the record does not provide "some evidence" that Scott is unsuitable for release due to the gravity of his offense or because he has a "significant history of violent crime."

## A.

### *The Gravity of the Commitment Offense*

The Governor's determination that the gravity of Scott's offense shows him unsuitable for release is doubly flawed. Not only is the determination unsupported by "some evidence," but the Governor failed to consider a factor indicative of suitability that he was required to take into account. We address the latter problem before turning to the insufficiency of the evidence of unsuitability.

### 1.

Putting aside factors relating to his offense and prior conduct, there is no dispute that all other applicable regulatory criteria clearly indicate Scott is suitable for release on parole. He has no juvenile record, possesses a stable social history, has performed acts which tend to indicate the presence of remorse, his age reduces the probability of recidivism, he has made realistic plans for release, and his activities while in prison indicate an enhanced ability to function within the law. The chief reason the Governor nevertheless found Scott unsuitable for release was the gravity of his offense.

The Governor's assumption that a prisoner may be deemed unsuitable for release on the basis of the commitment offense "alone" is correct (*Rosenkrantz, supra*, 29 Cal.4th at p. 682),[7] but the proposition must be properly understood. The commitment offense is one of only two factors indicative of unsuitability a prisoner cannot change (the other being his

---

[7] Indeed, it appears that gubernatorial reversals of Board decisions granting parole are most often based solely or primarily on the gravity of the inmate's offense. (*Rosenkrantz, supra*, 29 Cal.4th at pp. 684–685.) This is apparently also now true elsewhere in the United States. (Liptak, *To More Inmates, Life Term Means Dying Behind Bars*, N.Y. Times (Oct. 2, 2005) p. 1; Liptak, *Serving Life, With No Chance of Redemption*, N.Y. Times (Oct. 5, 2005) p. 1.)

"Previous Record of Violence").[8] Reliance on such an immutable factor "without regard to or consideration of subsequent circumstances" may be unfair (*In re Smith* (2003) 114 Cal.App.4th 343, 372 [7 Cal.Rptr.3d 655]), and "runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." (*Biggs v. Terhune, supra,* 334 F.3d at p. 917.) The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison. Yet, the predictive value of the commitment offense may be very questionable after a long period of time[9] (*Irons v. Warden of California State Prison—Solano* (E.D.Cal. 2005) 358 F.Supp.2d 936, 947, fn. 2.) Thus, denial of release solely on the basis of the gravity of the commitment offense warrants especially close scrutiny. "[T]he gravity of the commitment offense or offenses alone *may* be a sufficient basis for denying a parole application, *so long as the Board does not fail to consider all other relevant factors.*" (*In re Ramirez, supra,* 94 Cal.App.4th at p. 569, latter italics added; accord, *Rosenkrantz, supra,* 29 Cal.4th at pp. 660, 677; *Scott I, supra,* 119 Cal.App.4th at p. 891.) The Governor, who is subject to the same requirement, did not fulfill it in this case.

Under Board regulations, aspects of the commitment offense may indicate unsuitability or suitability for release. The offense is indicative of *unsuitability* when it was committed "in an especially heinous, atrocious or

---

[8] The Governor states in his decision that the gravity of Scott's offense is alone a sufficient basis "on which to conclude that his release from prison *at this time* would pose an unreasonable public-safety risk." (Italics added.) That statement could be repeated annually until Scott dies or is rendered helpless by the infirmities of sickness or age.

[9] It is worth noting, as has our Supreme Court (*People v. Murtishaw* (1981) 29 Cal.3d 733, 768 [175 Cal.Rptr. 738, 631 P.2d 446], disapproved on other grounds in *People v. Boyd* (1985) 38 Cal.3d 762 [215 Cal.Rptr. 1, 700 P.2d 782]), that a large number of legal and scientific authorities believe that, even where the passage of time is not a factor and the assessment is made by an expert, predictions of future dangerousness are exceedingly unreliable. (See, e.g., Monahan, *Violence Risk Assessment: Scientific Validity and Evidentiary Admissibility,* 57 Wash. & Lee L.Rev. 901 (2000); Otto, *On the Ability of Mental Health Professionals to 'Predict Dangerousness,'* 18 Law & Psychol. Rev. 43 (1994); Lidz et al., *The Accuracy of Predictions of Violence to Others,* 269 J.Am.Med.Assn. 1007 (1993); Diamond, *The Psychiatric Prediction of Dangerousness,* 123 U.Pa.L.Rev. 439 (1974); Dershowitz, *The Law of Dangerousness: Some Fictions About Predictions* (1970) 23 J.LegalEd. 24. According to a Task Force of the American Psychiatric Association, "[n]either psychiatrists nor anyone else have demonstrated an ability to predict future violence or dangerousness." (Am.Psych.Assn., Task Force Rep. 8, *Clinical Aspect of the Violent Individual* (1974) at p. 28.) As our Supreme Court has also noted, "the same studies which proved the inaccuracy of psychiatric predictions [of dangerousness] have demonstrated beyond dispute the no less disturbing manner in which such prophecies consistently err: they predict acts of violence which will not in fact take place ('false positives'), thus branding as 'dangerous' many persons who are in reality totally harmless. [Citation.]" (*People v. Burnick* (1975) 14 Cal.3d 306, 327 [121 Cal.Rptr. 488, 535 P.2d 352].)

cruel manner" (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1)), but the prisoner's "motivation" for the offense tends to show *suitability* when it was "the result of significant stress in his life, especially if the stress has built over a long period of time" (*id.*, § 2402, subd (d)(4)). In finding Scott unsuitable for release in 2001, the Board characterized his motive as "inexplicable or very trivial in relation to the offense." However, as we explained in *Scott I*, that conclusion was not only unjustified by the evidence but was reached without consideration of "undisputed evidence Scott committed his offense while under emotional stress [which] should have been, but was not, considered in his favor." (*Scott I, supra*, 119 Cal.App.4th at p. 890, fn. 9.)

■ In 2004, the Board found Scott suitable for release and granted parole, relying heavily on the evidence of emotional trauma and stress it previously failed to consider. The undisputed evidence Scott was suffering significant stress is substantial. It is highlighted in all the numerous evaluations of Scott over the years, is a primary reason all the psychologists and other professionals who conducted those evaluations consistently concluded Scott presented a low risk of future violence, and was the principal factor the Board relied upon in finding him suitable for release. The Governor's indifference to this large body of evidence significantly distorts the nature and gravity of Scott's commitment offense and denies him the right to "individualized consideration of all relevant factors" specified in Board regulations. (*Rosenkrantz, supra*, 29 Cal.4th at p. 655; see *In re Minnis* (1972) 7 Cal.3d 639, 646 [102 Cal.Rptr. 749, 498 P.2d 997].) As our Supreme Court has made clear, though the importance attached to the suitability criteria must be left to the judgment of the Governor, *"the Governor is required to consider whether the prisoner committed the crime as the result of significant stress in his or her life."* (*Rosenkrantz,* at p. 679, italics added.) The Governor's failure to consider this factor is difficult to fathom. We did not, in *Scott I*, merely call attention to the Board's failure to consider the stress factor when it denied Scott parole in 2001, but on remand *ordered* the Board to "consider evidence of all relevant circumstances identified in its own regulations as tending to show a prisoner suitable for release from prison" (*Scott I, supra,* 119 Cal.App.4th at p. 899), and made clear that whether "[t]he prisoner committed his crime as the result of significant stress in his life" was one such circumstance. (*Id.* at p. 897.) As the Governor is required to address the same factors the Board is required to consider (Cal. Const., art. V, § 8, subd. (b)), our opinion in *Scott I* magnified the Governor's obligation to consider the significant stress Scott was experiencing at and prior to the time he committed his offense.

The Governor's failure to consider whether Scott committed his offense "as the result of significant stress in his life" is arbitrary and capricious in the sense that he failed to apply the controlling legal principles to the facts before him. (*In re Ramirez, supra,* 94 Cal.App.4th at p. 571.)

## 2.

Entirely apart from the Governor's failure to consider the stress Scott was experiencing, there is not "some evidence" that the gravity of Scott's offense shows him unsuitable for release.

With respect to the gravity of the commitment offense, the Governor's decision is similar to that of the Board set aside in *Scott I*. The 2001 Board decision concluded, inter alia, that Scott was unsuitable for release because he committed his offense " 'in an especially heinous, atrocious or cruel manner,' " in that the offense was committed " 'in a dispassionate and calculated manner' " also demonstrating " 'an exceptionally callous disregard for human suffering.' " (*Scott I, supra*, 119 Cal.App.4th at p. 889.) Though the Governor's language is somewhat different—he characterizes the offense as "pitiless" rather than as "dispassionate" or showing "callous disregard for human suffering"—his decision is clearly based on the same factors. As we explained at some length in *Scott I*, the record there (which as to these factors is identical to that before us here) did not provide "a scintilla of evidence" Scott committed his offense " 'in a dispassionate and calculated manner, such as an execution-style murder,' " or in a manner demonstrating " 'an exceptionally callous disregard for human suffering.' " (*Scott I,* at pp. 889–892.) For these reasons (which we do not think it necessary to again explain), we held the record did not contain "some evidence" Scott was unsuitable for release on those grounds.[10]

The Attorney General emphasizes, however, that the Governor's findings are different from the Board findings reviewed in *Scott I*, and therefore he should not be bound by that ruling. Unlike the Board in 2001, the Governor found that the second degree murder of which Scott was convicted was "particularly heinous" because "[t]here is evidence in the record before me that Mr. Scott premeditated at some level to kill Mr. Bradford," and some witnesses reported that Bradford was "incapacitated" at the time Mr. Scott fired the final shot, showing that the killing was "pitiless." As earlier explained, the evidence of premeditation the Governor relied upon was that a witness reported seeing Scott "hiding on a staircase" near Bradford's home, and that during a discussion in a bar about a month before the killing Scott told a man about Bradford's threats and showed him a weapon he said "would protect him and take care of [Bradford]."

---

[10] Relying on the doctrines of res judicata and collateral estoppel, Scott claims the Governor is precluded from reconsidering whether the gravity of his offense provides a basis for denying him parole. Acknowledging that this issue has been left open by the Supreme Court (*Rosenkrantz, supra*, 29 Cal.4th at p. 668, fn. 15), the Attorney General maintains that such "application of the doctrine of collateral estoppel . . . would deprive [the Governor] of [his] Constitutionally granted power and violate the separation of powers." We find it unnecessary to decide the issue.

■ Before explaining the insufficiency of this evidence, it is necessary to remember that denial of parole based upon the nature of the offense alone may rise to the level of a due process violation, as "where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense." (*Rosenkrantz, supra,* 29 Cal.4th at p. 683.) Therefore, an unsuitability determination must be predicated on "some evidence that the particular circumstances of [the prisoner's] crime—circumstances beyond the minimum elements of his conviction—indicated exceptional callousness and cruelty with trivial provocation, and thus suggested he remains a danger to public safety." (*In re Dannenberg, supra,* 34 Cal.4th at p. 1098.) For example, premeditation was considered in *Rosenkrantz* because, though the prisoner had been convicted only of second degree murder, the evidence showed " 'a full week of careful preparation, rehearsal and execution,' " and that the prisoner, who "fired 10 shots at close range from an assault weapon and fired at least three or four shots into the victim's head as he lay on the pavement," carried out the crime with "planning, sophistication or professionalism." (*Rosenkrantz,* at p. 678.) Similarly, the evidence of premeditation relied on in *In re Lowe* (2005) 130 Cal.App.4th 1405 [31 Cal.Rptr.3d 1], which also involved a second degree murder conviction, showed that the prisoner purchased the gun shortly before the murder, entered his victim's bedroom in the middle of the night while he was asleep, unsuspecting, and in a special relationship of confidence and trust with his killer, " 'and shot him five times in the head and chest, execution style.' " (*Id.* at p. 1414.) As the court stated, this evidence showed the murder " 'was a cold-blooded execution' " and that the prisoner's " 'egregious acts [were] far more aggravated than the minimum necessary to sustain a second degree murder conviction.' " (*Id.* at p. 1415.) In *In re DeLuna, supra,* 126 Cal.App.4th 585, the petitioner, convicted of second degree murder, had a physical confrontation with the victim in a bar, left the bar, retrieved a rifle, shot the victim in the mouth and, as the victim bled and walked around the parking lot, followed him and continued firing until he died. The Court of Appeal determined that "[t]he initial wounding and deliberate stalking of a defenseless victim can reasonably be characterized as especially cruel and callous." (*Id.* at p. 593.)

The circumstances of Scott's offense shown by the record, which bear no resemblance to the circumstances of the homicides in *Rosenkrantz, Lowe,* and *DeLuna,* cannot reasonably be considered more aggravated or violent than the minimum necessary to sustain a conviction of second degree murder. The evidence of premeditation and callousness relied upon by the Governor consists of a description by the trial judge of the trial testimony of George Davis and brief descriptions in the sentencing report of the trial testimony of two eyewitnesses to the crime. Assuming the trial judge's recollection of Davis's testimony is accurate, Davis's statement that Scott told him his

weapon would "protect him" against Bradford (who had threatened Scott physically on numerous occasions, once while placing a gun to his head) is far more indicative Scott intended to defend himself against further threats than of a planned homicide.[11]

In determining Scott committed his offense in an "especially atrocious" manner, the Governor made clear his rejection of Scott's version of the killing. In his decision, the Governor acknowledges that at the 2004 parole hearing Scott reiterated his earlier claim that he shot because "Bradford continued 'chasing towards [Mr. Scott]' even after the first shot. Mr. Scott said that, after the second shot, Mr. Bradford 'stumbled and fell' and that he began running away from Mr. Bradford at that point. He also told the 2004 Board that, when he looked back, Mr. Bradford was standing up again and—although he 'd[id]n't know if [Mr. Bradford] was moving towards [him]' at the time—that is when he fired the final shot in Mr. Bradford's direction." The Governor states that, "[a]though Mr. Scott need not recant his self-defense-like claim to be found suitable for parole, I need not accept his version of events in this regard as true. And given the evidence in the record before me, I do not." The trouble with the Governor's rationale is that there is no "evidence in the record" justifying the rejection of Scott's "self-defense-like claim." Nor is there any evidence showing Scott killed Bradford gratuitously, in a "pitiless" manner, as the Governor concluded.

At the 2004 parole hearing, as at all of the earlier hearings memorialized in the administrative record, Scott claimed not only that Bradford had previously threatened to kill him, but that he fired defensively at Bradford after he

---

[11] Scott testified at prior parole hearings that, for 10 years prior to the killing, he "often carried a gun because 'I carry a lot of money in the refrigeration and beverage business, the deli also, the money there, I handled all that back and forth to the bank for both businesses.' Scott realized the need to carry a weapon after 'a friend of mine one night stops at a place to make some refrigeration work, take care of some refrigeration work, he ended up getting killed, robbed and killed on the street corner.' " (*Scott I, supra,* 119 Cal.App.4th at p. 879, fn. 2.) At the 1999 parole hearing, Scott testified that his need for such protection increased when his wife became involved with Bradford, as it then "became quite apparent that my life was very much in danger from Mr. Bradford." Scott explained, for example, that "Mr. Bradford came to my deli and put a gun in my face and told me he was going to blow my, I'll leave out the expletive term, my head off. The police showed up and took that gun from him." This testimony is uncontradicted in the record.

When asked to comment about the trial judge's interpretation of his conversation in the bar with Davis, Scott stated that he was in the bar talking to Bradford's girlfriend, "asking her what she thought we could do to get my wife and Mr. Bradford away from each other." Davis, who overheard this conversation and knew Bradford, asked Scott what he would do if Bradford then walked into the bar. Scott said he replied: "I'm going to go out the back door if he comes in the front. I'm getting the hell out of here." Scott said that when Davis pointed out that Bradford carries a gun, he told Davis, "well, I've got a gun, too, it's enough to scare him off, and I held it in the palm of my hand. That's all that was about."

did not respond to warnings to stay back.[12] Chief Deputy District Attorney Wagstaffe did not take issue with this rendition of events, and it is not inconsistent with the jury's verdict, which convicted Scott solely on the basis of the felony-murder rule. Moreover, the district attorney who appeared at Scott's sentencing hearing conceded Scott may have fired "a warning shot . . . intended to cause a cessation of the confrontation." Scott's consistent assertions that he acted defensively in the face of provocation is also supported by the sentencing report prepared by the San Mateo County Probation Department, which "acknowledges 'there may well have been some provocation [of Scott] on the part of the victim,' " and a Department of Corrections evaluation relates that Scott's version of events closely matches those found in the probation officer's report " 'and other official records.' " (*Scott I, supra*, 119 Cal.App.4th at p. 879, fn. 2.)

■ The Governor is, of course, free to reject Scott's version of the manner in which he committed his offense, but *only* on the basis of "some evidence"—that is, the Governor's decision must have " 'some basis in fact.' " (*In re Powell, supra*, 45 Cal.3d at p. 904.) The record before the Governor contains little reliable information of any sort showing whether Scott was acting defensively (reasonably or unreasonably) at the time he killed Bradford and the precise circumstances in which he did so.[13] But the record contains *no evidence* Scott committed his offense "in an especially

---

[12] At the 2001 parole hearing, Scott testified that "three weeks prior to the killing Bradford 'put a gun in my face and told me he was going to blow my head off and in a number of vulgar ways of saying it, I guess. He threatened to blow my head off for going to the police over the fact that he was supplying my wife with drugs.' Scott also said that at the time of the killing, 'when he went for his gun, what I believed was his gun, I fired a warning shot at him in his direction, the next thing I knew he came around the front of the car, I wanted to go down the street that way to get away from this, I didn't want no part of this, and as he came around he was trying to pull a gun out of his waistband and I started running backwards, telling him to stay aware [*sic*] from me or I'll shoot you, by then I had, well I did have my gun out and he chased me backwards.' Scott admitted he never saw a gun in Bradford's hand, 'because I didn't, but he had both hands over on his side and he was going like this, I figured that if he gets that out I'm dead, and I just fired trying to scare him off and give me time to get away.' " (*Scott I, supra*, 119 Cal.App.4th at p. 879, fn. 2.) Scott gave much the same testimony at the 2004 parole hearing.

[13] As earlier indicated, the only evidence before the Governor regarding the manner in which Scott committed his offense (other than Scott's testimony at the parole hearings) are very brief statements in the sentencing report characterizing the trial testimony of eyewitnesses to the crime. The transcripts of the testimony of those eyewitnesses, David Ofakolo and John Loufas, were never made a part of the administrative record but they are included in an appendix of exhibits "lodged" by Scott with the clerk of this court at the time he filed his petition. The Deputy Attorney General stated at oral argument that, though the lodged documents are not part of the administrative record, he did not object to their introduction at this stage in the proceedings "in the interests of justice."

The testimony of the eyewitnesses corroborates Scott's version of what happened. Ofakolo and Loufas testified that when Scott approached Bradford and told him to stop kissing his wife, Bradford, a much larger man, immediately pushed Scott's wife aside and began chasing Scott,

heinous, atrocious or cruel manner," or that the nature of his crime indicates he poses a continuing threat to the public safety if released. Indeed, the record contains abundant *uncontradicted* evidence to the contrary. *All* of the many psychological evaluations of Scott emphasized that he committed his crime while he was experiencing an unusual amount of stress arising from unusual circumstances not likely to recur, and for that reason (as well as his prior crime-free life) there was a low risk he would commit another violent act if released. The life prisoner evaluation report prepared by the Department of Corrections reached the same conclusion, emphasizing that the fact that Scott committed his crime "during a brief period of extreme mental or emotional trauma" indicates he "would pose a low degree of threat to the public at this time if released from prison." The Governor may believe Scott would pose an unreasonable risk of danger to society if now released from prison, but that opinion finds no factual support whatsoever in the record that was before him.

### B.

### *Significant Criminal History*

 Under the regulations, the fact that a prisoner has a previous record of violence—i.e., that "[t]he prisoner on previous occasions inflicted or

who quickly turned around and ran. The witnesses agreed that at some point Scott "started running backwards," shouting " 'stop it or I am going to shoot you,' " but Bradford kept coming. Loufas said there were "probably two seconds" between Scott's first and final shots and agreed with Ofakolo that at the time of the final shot Bradford was "still trying to go after [Scott]." Also, Loufas said he saw Scott "standing on the stairs," not "hiding" in a stairwell, and that moments later Scott walked by him with his hands in his pockets, which does not suggest Scott was trying to conceal himself, as suggested in the sentencing report.

This evidence could and should have been presented by Scott's counsel at the 2004 Board hearing (see Cal. Code Regs., tit. 15, § 2249), because it contradicted the Board's prior determination that Scott killed Bradford "in a dispassionate and calculated manner, such as an execution-style murder." However, because the trial testimony was never presented to the Board, the Governor cannot be faulted for failing to take it into account. Although the eyewitness testimony can have no bearing on our assessment of the propriety of the Governor's decision, and does not, the belated emergence of this evidence demonstrates not just the erroneousness of the Governor's assumptions regarding the nature of Scott's offense, but the importance of the requirement that evidence underlying the parole authority's decision " 'have some indicia of reliability.' " (*Biggs v. Terhune, supra,* 334 F.3d at p. 915, quoting *Jancsek v. Oregon Bd. of Parole, supra,* 833 F.2d at p. 1390.) A parole hearing does not ordinarily provide a prisoner a very good opportunity to show his offense was not committed "in an especially heinous, atrocious or cruel manner," even if such evidence exists and the prisoner is willing to run the risk his effort to make such a showing will be seen as unwillingness to accept responsibility and therefore evidence of unsuitability. Trial transcripts do not exist in the many parole hearings involving prisoners convicted on a guilty plea, and they may be hard for many prisoners to obtain even if they had a trial. (Indeed, it is curious a transcript was made in Scott's case because, though he had a trial, he was convicted on a plea that required him to waive his right to an appeal.)

attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age" (Cal. Code Regs., tit. 15, § 2402, subd. (c)(2))—tends to show him unsuitable for release; while the fact that he "lacks any significant history of violent crime" (*id.*, § 2402, subd. (d)(6))—tends to show him suitable for release on parole. The Governor's decision does not indicate a willingness to reverse the Board's grant of parole solely on the basis of his disagreement with the Board's conclusion that Scott's "prior domestic violence" did not represent a "significant history of violent crime." All that is clear about the Governor's use of this factor is that he believed Scott had a "significant criminal history" and that he attached weight to it because it shows "Mr. Scott was undeterred [by the earlier law enforcement intervention] and unsuccessful at correcting his criminal conduct."

It is difficult to think the phrase "significant history of violent crime" (and also the regulatory reference to "Previous Record of Violence" (Cal. Code Regs., tit. 15, § 2402, subd. (c)(2)) encompasses events as temporally and situationally related to the commitment offense as those with which we are here concerned. The evidence shows, the Board found, and the Governor explicitly acknowledged that there is, to use the Governor's word, a "nexus" between Scott's crime and his previous altercations with his wife and Bradford. The prior events are so closely connected to the commitment offense in time and motivation that we believe it unreasonable to treat them as constituting a separate and distinct criminal history within the meaning of Board regulations. Furthermore, the regulation refers to a "*significant* history of *violent* crime" (*id.*, § 2402, subd. (d)(6), italics added), a phrase the Governor never employs. Scott's conduct simply does not rise to that level. Other than the bloody nose he gave his wife while trying to stop her from visiting her drug dealer/paramour,[14] for which he immediately took her to the hospital and was never prosecuted, Scott's prior acts did not result in injury to anyone. The only convictions he ever suffered were of misdemeanor reckless driving involving no bodily injury and vandalism relating to the same conduct. Furthermore, as the evidence amply demonstrates, and the Board expressly acknowledged, the prior conduct the Governor considered a significant history of violent crime "occurred over a period of only three or four months, at a time when Scott was under great stress, distraught and fearful." The Governor's indifference to the "extreme mental or emotional trauma" Scott was experiencing during the short period of time in which his

---

[14] The only evidence in the record bearing on the extent of this injury is Scott's testimony at the 1999 parole hearing. After stating that all he did was "slap her with the back of my hand a little bit," Scott explained that his wife's nose was extremely "sensitive" due to the fact that her "septum is all burned out from the methamphetamines she'd been inhaling and snorting," and that "just a slight touch of the nose would be enough to make it bleed a little bit."

prior criminal acts and the commitment offense took place warps the Governor's assessment of Scott's prior acts as much as it does his characterization of the commitment offense.

For the foregoing reasons, we conclude that the Governor's determination that Scott does not lack a "significant history of violent crime" showing him suitable for release, or the implied finding Scott possesses a "previous record of violence" showing him unsuitable for release, is not supported by any evidence.

## IV.

We concluded in *Scott I* "not simply that the evidence refutes rather [than] supports the findings relied upon by the Board to deny Scott parole [in 2001]," but that that decision "inexplicably and unjustifiably ignored abundant undisputed evidence showing him suitable for release." (*Scott I, supra,* 119 Cal.App.4th at p. 899.) The gravamen of our analysis in *Scott I* was "not that the evidence Scott is suitable for parole outweighs that showing him unsuitable, *but that there [was] no evidence he is unsuitable,* not even the 'modicum' required by *Rosenkrantz, supra,* 29 Cal.4th at page 677." (*Scott I,* at p. 899.) Those statements, which were based on a record that is for the most part identical to the one before us now, also describe our view of the Governor's decision reversing the Board grant of parole in 2004.

■ "Although the *Board* can give the prisoner a new hearing and consider additional evidence, the *Governor's* constitutional authority is limited to a review of the materials provided by the Board. ([Pen. Code,] § 3041.2, subd. (a); *In re Rosenkrantz, supra,* 29 Cal.4th at pp. 659–660 . . . .)" (*In re Smith* (2003) 109 Cal.App.4th 489, 507 [134 Cal.Rptr.2d 781].) The record before the Board in 2004 provides no evidence upon which to find Scott unsuitable for release on parole on the grounds relied upon by the Governor or on any other ground identified by applicable law and regulations. Since the record before the Board in 2004 provides no evidence to support a decision other than the one reached by the Board, a remand to the Governor in this case would, as the *Smith* court observed, "amount to an idle act." (*Ibid.*)

■ Considering that the Governor's decision reversing the Board's grant of a parole release date to Scott was not made in accordance with applicable legal principles and not supported by "some evidence," that reversal cannot stand, and Scott is therefore entitled to the release date ordered by the Board.

## DISPOSITION

The Governor's decision reversing the Board decision granting Scott parole is vacated. Scott's petition for habeas corpus is granted. The Board is ordered to release Scott pursuant to the conditions set forth in its decision of July 20, 2004, granting him parole and setting a release date. Considering that the release date set by the Board was October 4, 2001, more than four years ago, and in the interests of justice, this opinion shall be final as to this court immediately. (Cal. Rules of Court, rule 24(b)(3).)

Lambden, J., and Pollak J.,* concurred.

Respondent's petition for review by the Supreme Court was denied November 30, 2005, S138430. Baxter, J., was of the opinion that the petition should be granted.

---

*Associate Justice of the Court of Appeal, First Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.