[No. A124814. First Dist., Div. Two. Mar. 16, 2010.]

In re BENNIE MOSES on Habeas Corpus.

## COUNSEL

Jennifer Sheetz, under appointment by the Court of Appeal, for Petitioner Bennie Moses.

Edmund G. Brown, Jr., Attorney General, Julie L. Garland, Assistant Attorney General, Anya M. Binsacca and Steven G. Warner, Deputy Attorneys General, for Respondent State of California.

## OPINION

**LAMBDEN, J.**—Petitioner Bennie Moses was 30 years old on Thanksgiving Day in 1979 when he and his brother drove around Oakland, California, visiting family and friends. At one of their stops, Moses, having consumed copious amounts of alcohol and talked about "getting even," visited Willie Rhodes, whose brother had killed Moses's father in a gambling dispute five years before. Moses shot Rhodes once at close range, killing him, and fled. He voluntarily surrendered to police later that day. A jury found Moses guilty of second degree murder; the trial court sentenced him to serve 17 years to life in prison. Moses was sent to prison in 1980. Under California's statutory parole scheme he was presumptively eligible for release over a dozen years ago.

Moses's behavior in prison has been exemplary. He has a nearly spotless disciplinary record (his only instance of misconduct was watching television

without using the required headphones 27 years ago). He has performed years of outstanding work in the prison laundry. He has shown insight into the causes of his actions and worked to understand and change his behavior by engaging in decades of self-help programs such as Alcoholics Anonymous (AA) and the Victim Offender Reconciliation Group (VORG). He has consistently taken responsibility and repeatedly expressed remorse for his commitment offense. Nonetheless, after 29 years, 13 parole consideration hearings, and three decisions to grant parole by the Board of Parole Hearings (Board), Moses remains in jail. Governor Arnold Schwarzenegger has reversed all three of the Board's decisions to release Moses. We ask, "why?"

The Governor found that Moses's release on parole posed an unreasonable risk of danger to public safety for three reasons, each of which is seriously flawed. First, the Governor concluded that the second degree murder was "especially atrocious." This conclusion is not supported by the evidence, and not only because the Governor ignored, or inaccurately described, certain critical and undisputed factual circumstances. Second, the Governor concluded that, while Moses "says he accepts responsibility for his actions and is remorseful, he maintains that he shot [Rhodes] in self defense." Moses has not maintained such a claim; furthermore, any discrepancies between Moses's account of the shooting are insignificant in light of his undisputed acceptance of responsibility for the crime, his repeated expressions of remorse, and his postconviction history. Third, the Governor stated that, at the time of the murder, Moses "had a significant record of criminal violence," even though Moses did not have such a record. The Governor's analysis merely mentions without discussion other very significant parole suitability factors, such as Moses's flawless behavior in prison for the last 29 years. In short, the Governor's reasoning relies heavily on immutable factors, at times unsupported by evidence, and amounts to little more than the "rote recitation" of only those factors suggestive of risk. (*In re Lawrence* (2008) 44 Cal.4th 1181, 1210 [82 Cal.Rptr.3d 169, 190 P.3d 535] (*Lawrence*).)

The Governor did not articulate any rational nexus between his reasons for reversing the grant of parole and any purported present, unreasonable risk of danger to public safety posed by Moses's release, thereby failing to meet the standard necessary for the denial of parole discussed by our Supreme Court in *Lawrence, supra*, 44 Cal.4th 1181. We conclude that there is no evidence in the record to support the Governor's repeated reversals of the Board's grant of parole and that further consideration by the Governor cannot fill that void.

██ Therefore, we hold that the Governor's reversal of the Board's decision to grant parole violated Moses's due process rights. We grant

Moses's petition, order the Governor to vacate his decision, and reinstate the Board's July 10, 2007 grant of parole.

## BACKGROUND

### *Moses's Second Degree Murder of Rhodes*

At Moses's July 2007 parole consideration hearing before the Board, the presiding commissioner read this account of Moses's murder of Rhodes from the Board's April 24, 2006 report:

" '[B]rothers Bennie and Larry Moses were driving around Oakland, stopping in to see friends and relatives and drinking. Bennie consumed copious amounts of alcohol. They stopped at their sister Joyce's house. Joyce was married to Eddie Rhodes, the victim's brother. Bennie, Larry and Eddie then drove to a liquor store, and Bennie Moses showed Eddie Rhodes his 44 Magnum revolver and smiled. Eddie asked Bennie what . . . that was supposed to mean, and received no answer. At the time of this incident, Larry Moses was seated in the back seat of the automobile. When the three men returned to Eddie and Joyce's home, Eddie heard Bennie talking to his sister about getting even. Joyce asked Bennie to leave, so Larry and Bennie departed.

" 'Bennie and Larry stopped by the home of their sister Mary. Bennie waited in the car while Larry went inside. Larry walked in, walked around the living room, and left, slamming the door. Mary asked him where he was going, but Larry did not answer. About 3:30 p.m., Willie Rhodes was home with his common-law wife and two adult friends. There were six children in the house, the oldest Ramona . . . aged 13. The adults were in the kitchen and the children were in the dining room. There was a single knock at the front door and in walked Bennie Moses. Bennie walked into the dining room and asked to see Willie Rhodes. Ramona saw that Bennie had a large revolver in his right hand and that the hammer was cocked. Willie came out of the kitchen, noticed the gun, and said that it was a nice piece.

" 'The two men then walked into the living room and stopped. Bennie raised the gun to Willie's left side, with the muzzle a few inches from him and fired. Willie stumbled back and collapsed. Ramona saw what looked like a rifle barrel come through the open front door and then disappear. Next, Ramona saw Larry Moses look in the front door, and then he closed the door. Bennie said, bye, and went out the door. Ramona then went across to a bathroom window and saw Bennie and Larry Moses running across a parking

lot toward the back door of a Laundromat. Willie Rhodes was pronounced dead about 40 minutes after the police arrived at the scene. The results of the autopsy were that the bullet had entered the victim's chest on the left side and came out his right side, finally lodging in his right bicep. The bullet had destroyed the victim's liver.' "

This account is almost identical to that written by a senior trial deputy district attorney of the Alameda County District Attorney's Office in a July 1980 letter to the probation department, prior to Moses's sentencing. That letter further recounted: "When the police arrived, chaos reigned. Willie's common-law wife, Esther . . . , in a fit of hysteria had shoved her hand through a window and been severely gashed on the arm. She was standing on the front porch amid a large amount of blood while inside kids were running in all directions, screaming and yelling."

The deputy district attorney also stated that Moses's father was shot to death by the victim's brother five years before over a $2 gambling debt; that Moses surrendered to police shortly before midnight on the day of the killing; that his brother surrendered the next day; that the murder weapon, registered to Moses, was found in February 1980 under a house in San Leandro; and that Moses's brother was convicted of voluntary manslaughter.

The record also contains an August 8, 1980 probation department report. It summarized Moses's offense this way: "On November 22, 1979 (Thanksgiving Day), the defendant and his brother [(a codefendant)] visited various relatives during the course of the day. Defendant was drinking heavily. The two defendants went to the home of the victim . . . . Defendant entered, asked to see Willie, and the two men went in the living room. A short time later, Willie was killed by a single shot, and defendant and his brother ran away from the scene."

At the 2007 Board hearing, the presiding commissioner, after reading the account, asked Moses to state what happened in his own words. Moses stated: "We left my sister Joyce's house, Mary's house, and then we was on my [sic] way over to my auntie's house, my aunty, she lived a few blocks down from Willie. My brother [Larry] had to use the bathroom." Moses continued: "And before, he couldn't wait, so he went by the big tree, and I went on and knocked on the door and went in. And then I see Willie, like I said, and we walked into the living room, me and him went to arguing there for a minute. I started to walk, tried to walk, and then we kept on arguing and fussing. Next thing I know, he was talking about hurting me. See, I know Willie really well, and he ain't a good person. And next thing I knew, he went to reach in his pocket, and I pulled mine out of my waist, it wasn't in my

hand, and shot him and ran. . . . My brother never entered the house, and he didn't have a rifle."

Moses told the Board that he had his gun tucked in his waist when he entered Rhodes's home; that he did not know why his brother Larry went into Mary's house and slammed the door; that he did not know why Larry needed to stop at Rhodes's house when they were a couple of blocks from their destination, but guessed that he could not "hold it," which was also why Larry relieved himself by the tree rather than enter Rhodes's house; and that his brother was under the influence of alcohol as well. Moses also said that he did not recall seeing any children in Rhodes's house.

Moses acknowledged to the Board that Rhodes was the brother of Moses's sister's husband, and that one of Rhodes's brothers had killed his father some years before. He denied that he was upset with Rhodes because of the death of Moses's father, but said that he "knew . . . what he was. He even shot his own brother." Moses said that he "had nothing against" Rhodes, stating, "I knew him. We worked together, we drank together." When asked specifically why he went to see Rhodes, Moses replied, "I know him."

The 1980 probation department report stated that "Rhodes was on felony probation for assault at the time he was killed. He had a prior record for assaults and a history of being armed. His probation offense involved shooting at his brother. He was considered to be an alcoholic. On October 24, 1979, he had been arrested for false imprisonment and other charges after he held his wife and her children at gunpoint and threatened to kill them. Police were able to talk him out of the house. Later, his wife refused to sign a complaint, and Willie told his probation officer the gun was a toy."

Throughout the 2007 Board hearing, Moses acknowledged that he had a drinking problem at the time of the murder, and had been drinking that day. He stated that he started drinking alcohol as a child, and drank sometimes on the weekdays, "pretty much" every weekend, "to feel good." He described himself as a "recovering alcoholic."

When the presiding commissioner, trying to "figure out the scenario," stated that "[i]t's Thanksgiving Day, and you're visiting family to family to family, and you're packing a gun," Moses stated, "But you know, too, Ma'am, I think alcohol played a great, great role in that, too." He told the Board that he was carrying a gun when he entered Rhodes's home because "[a] week prior to that incident, we went to 65th Village, which is the projects in Oakland, me and my wife. We was going to visit her mother. A man tried to get in the driveway, and only one car can get in the driveway, so I blowed, he wouldn't move. And then I asked him will he move, and then he

pulled out a gun on us, and then he drove on by and shook it at me. And so that's, every time I go over there, I usually take that with me, because I was scared." He also stated that he had gone to see his mother-in-law earlier that day, and that after shooting Rhodes he dropped the gun in the living room and left, and had no idea how it ended up in San Leandro.

Moses's account of events to the Board was similar to what he said in 1980, as described in the 1980 probation department report: "When he was interviewed, defendant denied that he had a grudge against Willie Rhodes. He states that they often drank together and were on good terms. However, defendant knew [Rhodes] had a bad temper and a history of shooting at people. [¶] Defendant states he was drinking heavily on the day of the present offense. He was carrying a gun because someone had threatened him a few days earlier. Defendant stopped by to visit with Willie Rhodes. As he entered the house, Willie started cursing him, and defendant saw him reach for a gun. Defendant pulled out his gun and shot and ran away from the house. He says his brother's part in it was just to poke his head in after he heard the shot. Defendant then went to his mother-in-law's house and slept for awhile before he surrendered himself."[1]

### *Moses's History Before the Murder*

The 1980 probation department report stated that Moses was born in Arkansas, moved to Oakland in 1958, and was the second of 10 children. Moses said he had dropped out of school in ninth grade, had completed a welding course, was unemployed at the time of the murder, had worked in a foundry and in construction, had married in 1977,[2] had two children born of casual relations with other women, did not use drugs, and, although he admitted to drinking beer and gin, "mostly on holidays," he did not consider himself to have a drinking problem.

The 1980 probation department report further stated that "the family pattern includes heavy drinking and fighting. The parents were arrested for drunkeness [sic], assault with a deadly weapon, and battery. The children grew up in a disruptive atmosphere with predictable results. Most of the family have arrest records. One brother was shot and killed during a robbery. Defendant's father was shot to death in 1975 by Willie Rhodes's brother. Defendant's brother, Larry, the co-defendant in the present offense, is on probation for shooting one of his sisters."

---

[1] In his 1980 letter, the deputy district attorney stated only that Moses and his brother claimed self-defense, unreasonable, but honest belief that self-defense was necessary, and diminished capacity, without providing further details.

[2] In the course of a 2007 interview for his psychological evaluation, Moses said that he and his wife divorced in 1984. His petition brief states that they were divorced in 1983.

As for Moses's prior criminal history, the 1980 probation department report stated that his juvenile and adult probation records had been destroyed. However, it stated that Moses was committed as a juvenile to the California Youth Authority in 1965 for a violation of Penal Code section 245, and paroled seven months later. Moses told the Board in 2007 that he could not remember the charge, but that he was sent to the California Youth Authority as a child "for my aunty, my uncle was beating up my aunty, and she was hollering for help and I helped her. But she wouldn't come to the court and testify for me, so they sent me to Nellis for, I think, 90 days or something like that."

The 1980 probation department report further stated that FBI records indicated that Moses had been convicted in March 1968, in Oakland, for violations of Penal Code section 211 and former section 217, involving robbery and assault with the intent to kill respectively (Pen. Code, § 211; history for Pen. Code, former § 217), was committed to the Youth Authority in October 1968 after a 90-day observation at Vacaville, was paroled in November 1969, and was discharged in May 1971. Moses told the Board in 2007 that he went to the Youth Authority twice, the second time for "assault." When asked about the 1968 conviction, he stated: "Drinking again. So I took my, what was it, my brother-in-law's pistol out of the house, and next thing I know we was drinking and a friend of mine took me back to the house. His car was full of people, and then I asked for another shot of the whiskey, and when I took my hand up there, one of the ones tried to snatch the gun out of my hand and it went off."

From 1971 until his murder of Rhodes, there is no indication that Moses had any other incidents involving law enforcement, and he had no further criminal record.[3]

### Moses's Postconviction History in Prison

Moses has an exemplary postconviction history. For the 27 years between his commitment and the 2007 Board hearing, he did not commit a single significant infraction of prison rules. According to Moses, he received only one custodial infraction in 1982, for watching television without headphones.

Prior to the 2008 Board hearing, forensic psychologist John T. Rouse prepared a June 2007 psychological evaluation of Moses. Rouse stated that

---

[3] The 1980 probation department report stated that "defendant has a conviction for a violent crime in 1968, but since he was released from the Youth Authority, he has been able to avoid law problems." The deputy district attorney's 1980 letter stated that "[t]he defendant Bennie Moses was convicted in 1978 of robbery and in 1979 of assault with a deadly weapon. Larry was granted probation on both charges." This reference to "Bennie" appears to have been an error, and intended as a reference to Larry.

Moses had obtained a pre-GED, but had not completed the requirements for a GED, as he suffered from sleep apnea, which was "a predominant factor in disallowing his ability to succeed academically." While in prison, he had participated in a stress management program, men's violence prevention, and VORG. Moses had worked for approximately 13 years in the prison laundry and received "laudatory" work reports. Rouse also reported that Moses "took full responsibility for his commitment offense in a genuine, non-defensive or minimizing manner," and that "Moses's alcohol abuse was a marginalizing factor in his life of crime. This examiner has the opinion that alcohol diminished his judgment and caused him to be impulsive. However, since his incarceration, he has remained alcohol free and has participated regularly in AA over the course of the past 27 years."

After indicating that Moses had no history of mental disorder, Rouse concluded that "[p]rior to his commitment offense, the most salient risk factor for Mr. Moses's risk of dangerousness was his alcohol abuse and its effects, mainly impulsivity and poor judgment. Subsequent to his 27 years of incarceration, Mr. Moses has demonstrated a sustained level of impulse control and appropriate judgment and decision making, as evidenced by his disciplinary-free behavior and the fact that he has been an active participant in AA and other self-help programs." Rouse was "of the opinion that Mr. Moses presents as a low risk of dangerousness when compared to the average citizen in the community and is still a suitable candidate for parole."

Rouses's report is entirely consistent with the two previous psychological evaluations of Moses, which the Board relied on in 2003 and 2005 to grant parole to Moses, only to see these decisions reversed by the Governor. In 2002, clinical psychologist Robert Wagner, Ph.D., reported that Moses stated in an interview that he was intoxicated on the day of the crime, would never drink again, and that Moses "thinks about the crime nearly every day and expressed sincere sorrow for the crime." After reviewing Moses's history and mental status, Wagner concluded that "Moses was not demonstrating a rising level of dangerousness at the time of the crime, and had been arrest free for almost 10 years. His subsequent time in prison has been disciplinary free and violence free. His level of dangerousness has been less than average for this population. It appears that two decades of responsible behavior can be trusted and the internal controls are sufficiently in place to assure a safe return to the community."

The following portion of a psychological report prepared by a Dr. Taylor in 2004 was read at the 2007 hearing: "Mr. Moses has upgraded himself educationally and vocationally despite possible cognitive difficulties, and has held a long-term job while in prison. He has continued to work on self-improvement through various self-help groups. His disciplinary history is

exemplary. He acknowledges his responsibility for the crime and appears remorseful. Alcohol appears to have played a part in the crime. He has been involved in substance abuse treatment at length. Continued substance abuse treatment on the outside would be recommended to continue with support group and abstinence. No evidence of psychiatric problems related to risk of dangerousness is noted. For this reason, he is considered to have a low, on a scale of high, medium, low, risk of dangerousness upon release at this time."

At the 2007 Board hearing, Moses was asked about various aspects of his postcommitment activities and perspective. Regarding drinking, Moses said that he had been in AA for 27 years and had maintained his sobriety during that time, that he went to AA "all the time," had "pretty much" worked through all of AA's steps, and "always will go to AA." He said that if he were released, he had a sponsor and a group in Oakland, though he could not remember his sponsor's name. He also stated that he was going to continue with AA "out there," and that he was "never going to drink again, ever."

When asked at the 2007 Board hearing if he had continued to engage in self-help since 2004, Moses stated that he had participated in a men's violence prevention program again "a little later than that." However, his petition brief states that he participated in men's violence prevention and family violence prevention in 2003. Moses stated at the hearing that he continued to attend all VORG meetings, which occurred every two weeks, where he met with and talked with victims. According to Moses, in order to participate, "you have to admit to your crime. And I've been in there ever since '90." His petition brief states his participation in VORG began in 1993.

Moses told the Board that he had been working in the prison laundry for the past 12 years, and had never missed a day of work. He said that his sleep apnea did not create particular difficulties for him working as long as he kept busy, and that he did not take medication for it. A deputy commissioner noted a 2005 letter in his file by a prison official recommending him to any employer based on his laundry work, as well as "numerous laudatory chronos" about his work.

As for his plans if he were paroled, Moses said that he had saved over a thousand dollars, had maintained good relations with family members and, if released, planned to live with family members in the Oakland area. He indicated that he had a job offer, which was later withdrawn, and planned to find construction work with a union with the help of family.

Moses also addressed his murder of Rhodes, and his remorse for it, a number of times during the 2007 Board hearing. He stated, "I just want to let

this Panel know that I am deeply sorry for what happened, and I know alcohol now played a great role in what happened at that time."

When asked what he would tell the Governor, Moses said, "I done learned my lesson. I'd tell him, how would I put it? I know what I done was wrong. I'd tell him, really, I am sorry for what I done. I would just basically be honest and tell the truth, and ask for, ask for forgiveness, you know."

When asked if he committed the crime out of stress, he said, "It could have been, I think so, yeah," and identified it as "[a]lcohol, basically."

When asked if he had anything to add to his parole plans, Moses replied, "Just I'm going to go out there, do what's right. I really, basically, I want to help, let kids know, in AA or anywhere, my grandkids know that alcohol, guns, all that ain't good. I just, I really want to let people know, and let them know what happened to me, just sit back and listen to me talk."

### Procedural History

### The Board's July 2007 Decision

In July 2007, the Board, for the third time, found Moses suitable for parole. The Board's presiding commissioner stated that Moses had enhanced his ability to function within the law through participation in a variety of programs, referring specifically to his "numerous laudatory chronos" for the quality of his work and his "character for steadfastness, loyalty and morality and behavior in the laundry"; his long-standing participation in AA and VORG; his participation in stress management and men's violence prevention as recently as 2004; his good presentation, and his obtaining a pre-GED. The Board also believed that "due to maturation, growth and greater understanding . . . [and] age . . . you have a reduced probability of recidivism," that Moses's parole plans were realistic, and that he had long-standing family support and offers of a place to live. Moses also had "maintained positive institutional behavior," had "shown remarkable resilience," and had the lowest classification score possible. The commissioner said that the Board believed Moses understood the magnitude of the offense and accepted responsibility for it, and expressed the personal belief that Moses would not ever drink again.

A deputy commissioner also referred to concerns the Governor had expressed in his two reversals about Moses's insufficient participation in self-help programs and the crime itself. The commissioner expressed the view that Moses had engaged in extensive rehabilitative efforts while in prison, and taken responsibility for the crime, expressing remorse that was "genuine and heartfelt."

The commissioner calculated that Moses needed to serve 9.34 years, and had served 27. She announced as conditions of parole that Moses not use or possess alcoholic beverages, submit to alcohol testing, participate in a substance abuse program such as AA or Narcotics Anonymous, report to the parole outpatient clinic for evaluation, and have no contact with Rhodes's family without prior approval by a parole agent. The commissioner concluded: "I applaud your perseverance. You have handled yourself great today. I don't know what more we can say, in that we truly do believe in you, have faith in you, and I would like to see you walk out of here."

### Moses's First Writ Petition

As stated in the superior court's April 2009 order denying Moses's petition, the Board's July 2007 proposed decision was referred to the Board's decision review unit. The unit recommended disapproval and a rehearing because an offer to employ Moses had been withdrawn. In October 2007, the Board voted to disapprove its prior proposed grant of parole, and to schedule a rehearing. Moses filed a petition for writ of habeas corpus with the Alameda County Superior Court. The court granted the petition, vacated the Board's October 2007 decision, and reinstated the Board's July 2007 grant of parole.

### The Governor's June 2008 Reversal of the Board's Decision

On June 23, 2008, Governor Arnold Schwarzenegger reversed the Board's July 2007 grant of parole of Moses. The Governor acknowledged that Moses had maintained a "discipline-free prison misconduct record," engaged in various self-help programs, "received favorable evaluations from various correctional and mental health professionals over the years," and had "supportive relationships and close ties with family and friends." However, the Governor stated that Moses's second degree murder of Rhodes "was especially atrocious because of the calculated and dispassionate manner in which it was carried out," that "[a]lthough Bennie says he accepts responsibility for his actions and is remorseful, he maintains that he shot Willie in self-defense," and that "[i]n addition, Bennie was 30 years old at the time of the murder, and he had a significant record of criminal violence." The Governor concluded that these negative factors "presently outweigh the positive factors. Accordingly, because I believe his release from prison would pose an unreasonable risk of danger to society at this time, I REVERSE the Board's decision."

Moses filed a second petition for writ of habeas corpus in the Alameda County Superior Court, this time challenging the Governor's reversal of the Board's decision. The superior court denied the petition in its April 2009

order, concluding that the Governor gave individualized consideration of all relevant factors, and that "[i]t is clear from the Governor's letter that he based his decision to reverse the grant of parole primarily based on [Moses's] lack of insight, and the commitment offense, as well as [Moses's] criminal history." The court found that some evidence supported the Governor's conclusions, except that the evidence did not support the finding that Moses had a *significant* record for violence. The court concluded that, despite this erroneous determination, "a review of the Governor's letter clearly evidences that he independently and primarily found that [Moses] poses an unreasonable risk of danger based upon the commitment offense and [Moses's] lack of insight," and that he acted within his discretion and was supported by some evidence in doing so. In May 2009, Moses filed his petition for writ of habeas corpus with this court.

## DISCUSSION

As we have indicated, in his June 2008 letter, the Governor stated three reasons for his reversal of the Board's grant of parole to Moses, these being the nature and circumstances of the crime, the Governor's rejection of Moses's purported claim of "self-defense," and Moses's "significant record of criminal violence." The Governor concluded that these reasons "presently outweigh[ed]" the positive factors.

In his petition brief, Moses argues that the Governor's decision was arbitrary, capricious, unreasonable, not supported by "some evidence" that Moses posed an unreasonable risk of danger to society, and unjustifiably based on unchanging circumstances of immutable factors in violation of Penal Code section 3041 and the due process clauses of the California and United States Constitutions.[4] Moses further argues that the Governor did not consider all of the relevant factors of suitability, rendered a decision based upon immutable factors in violation of certain federal case law, and that due process demands Moses be immediately released from state custody. At the core of Moses's petition argument is his request "that this court apply *Lawrence*, [*supra*, 44 Cal.4th 1181] to the present case and affirm the bounds of due process. Here, due process demands that the Governor articulate a reasoned decision in depriving Moses of his due liberty for a third time, due process demands that the Governor give more than carefully constructed lip service to Moses's evidence of suitability, and due process demands that the Governor provide a compelling articulation of current dangerousness in depriving Moses his grant of parole for a third time . . . . At some point the

---

[4] Although Moses states in his petition brief that his equal protection rights have been violated, he does not present competent arguments in favor of this view. Accordingly, we disregard his reference to his equal protection rights. (*In re Ross* (2009) 170 Cal.App.4th 1490, 1514 [88 Cal.Rptr.3d 873].)

repeated reliance upon static factors in determining dangerousness constitutes a due process violation."[5] We agree with Moses that the Governor's decision violated his due process rights, though not necessarily for all of the same reasons asserted by Moses.

## I. *The Governing Law*

■ Our state and federal Constitutions prohibit the state from depriving any person of life, liberty, or property without due process of law. (U.S. Const., 14th Amend., § 1; Cal. Const., art. I, § 7.) In *Lawrence, supra*, 44 Cal.4th 1181, the Supreme Court provided a comprehensive summary of our laws regarding parole. ■ The court made clear that the Board and the Governor exercise great discretion in their parole determinations, but that this exercise is not unbounded. The Supreme Court stated: ■ "The applicable statutes provide that the Board is the administrative agency within the executive branch that generally is authorized to grant parole and set release dates. ([Pen. Code,] §§ 3040, 5075 et seq.) The Board's parole decisions are governed by section 3041 and title 15, section 2281 of the California Code of Regulations (Regs., § 2230 et seq.). Pursuant to statute, the Board 'shall normally set a parole release date' one year prior to the inmate's minimum eligible parole release date, and shall set the date 'in a manner that will provide uniform terms for offenses of similar gravity and magnitude *in respect to their threat to the public* . . . .' ([Pen. Code,] § 3041, subd. (a), italics added.) Subdivision (b) of section 3041 provides that a release date must be set 'unless [the Board] determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the *public safety* requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting.' (Italics added; see [*In re Rosenkrantz* (2002) 29 Cal.4th 616,] 654 [128 Cal.Rptr.2d 104, 59 P.3d 174].)" (*Lawrence, supra*, 44 Cal.4th at pp. 1201–1202, fn. omitted.)

■ As the Supreme Court explained in *Lawrence, supra*, 44 Cal.4th 1181, title 15, section 2402 of the California Code of Regulations,[6] is virtually identical to Regulations section 2281, the parole suitability regulation followed in *Lawrence*. (*Lawrence, supra*, 44 Cal.4th at p. 1201, fn. 5.) The

---

[5] See also *Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910, 916–917, and *Irons v. Carey* (9th Cir. 2007) 505 F.3d 846, 853 (each raising due process concerns about the reliance on the immutable circumstances of offenses in denying parole). One of Moses's arguments is that the Governor's decision violates his due process rights solely on the basis of these cases. In light of our ruling herein based on *Lawrence, supra*, 44 Cal.4th 1181, we need not address this particular argument further, other than noting that the two cases are favorably discussed in *Lawrence*. (*Id.* at pp. 1220, fn. 20, 1221.)

[6] We refer to the California Code of Regulations as Regulations. All further references to the Regulations are to title 15, unless otherwise specified.

only difference is that Regulations section 2402 provides parole consideration criteria and guidelines for murders committed on or after November 8, 1978. (*Lawrence*, at p. 1201, fn. 5.) Regulations section 2402 controls here because Moses murdered Rhodes on Thanksgiving Day in 1979.

■ Regulations section 2402 sets forth the factors to be considered by the Board in carrying out the mandate of Penal Code section 3041. The regulation is designed to guide the Board's assessment of whether the inmate poses "an unreasonable risk of danger to society if released from prison," and thus whether he or she is suitable for parole. (Regs., § 2402, subd. (a).) The regulation also lists several circumstances relating to *unsuitability* for parole and the mitigating circumstances of the crime. (Regs., § 2402, subds. (c), (d).) Finally, the regulation explains that the foregoing circumstances "are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel." (Regs., § 2402, subds. (c), (d); see *Lawrence, supra,* 44 Cal.4th at pp. 1201–1203 [summarizing Regs., § 2281].)

■ The factors listed in Regulations section 2402 include "the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability." (Regs., § 2402, subd. (b); see *Lawrence, supra,* 44 Cal.4th at p. 1202, fn. 6 [summarizing Regs., § 2281, subd. (b)].)

■ Unsuitability factors stated in Regulations section 2402, subdivision (c), are (1) a commitment offense carried out in an "especially heinous, atrocious or cruel manner"; (2) a "Previous Record of Violence"; (3) "a history of unstable or tumultuous relationships with others"; (4) "Sadistic Sexual Offenses"; (5) "a lengthy history of severe mental problems related to the offense"; and (6) "serious misconduct in prison or jail." (Regs., § 2402, subd. (c)(1)–(6); see *Lawrence, supra,* 44 Cal.4th at p. 1203, fn. 7 [summarizing Regs., § 2281, subd. (c)].)

■ Suitability factors stated in Regulations section 2402, subdivision (d), are (1) the absence of a juvenile record; (2) "reasonably stable relationships with others"; (3) signs of remorse; (4) a crime committed "as the result of significant stress in [the prisoner's] life"; (5) battered woman syndrome;

(6) the lack of "any significant history of violent crime"; (7) "The prisoner's present age reduces the probability of recidivism"; (8) "The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release"; and (9) the inmate's "[i]nstitutional activities indicate an enhanced ability to function within the law upon release." (Regs., § 2402, subd. (d)(1)–(9); see *Lawrence, supra,* 44 Cal.4th at p. 1203, fn. 8 [summarizing Regs., § 2281, subd. (d)].)

The Governor may conduct a de novo review of the Board's decisions on the basis of the same factors that the Board is required to consider. (*Lawrence, supra,* 44 Cal.4th at p. 1203, fn. 9; Cal. Const., art. V, § 8, subd. (b); Pen. Code, § 3041.2.) In *In re Rosenkrantz, supra,* 29 Cal.4th 616 (*Rosenkrantz*), our Supreme Court indicated that under our deferential standard of review, "[a]s long as the Governor's decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the Governor's decision." (*Id.* at p. 677.)

In *Lawrence, supra,* 44 Cal.4th at page 1212, the Supreme Court clarified that a decision to deny parole must be based upon "some evidence" of current dangerousness. As the court explained in a companion case it issued on the same day as *Lawrence, In re Shaputis* (2008) 44 Cal.4th 1241 [82 Cal.Rptr.3d 213, 190 P.3d 573] (*Shaputis*), it determined in *Lawrence* that "the aggravated nature of a commitment offense does not, in every case, provide relevant evidence that an inmate remains dangerous, and a focus upon the egregiousness of the commitment offense to the exclusion of other relevant evidence has proved in practice to obscure the core statutory emphasis upon *current* dangerousness . . . . [¶] Accordingly, '. . . *the relevant inquiry is whether the circumstances of the commitment offense, when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness many years after commission of the offense. This inquiry is, by necessity and by statutory mandate, an individualized one, and cannot be undertaken simply by examining the circumstances of the crime in isolation, without consideration of the passage of time or the attendant changes in the inmate's psychological or mental attitude.'* " (*Shaputis,* at pp. 1254–1255, italics added.)

Thus, the *Lawrence* court explained, in reviewing parole determinations by the Governor, "[o]ur deferential standard of review requires us to credit the Governor's findings if they are supported by a modicum of evidence. [Citation.] This does not mean, however, that evidence suggesting a commitment offense was 'especially heinous' or 'particularly egregious' will eternally provide adequate support for a decision that an inmate is unsuitable

for parole. . . . [T]he Legislature specifically contemplated both that the Board 'shall normally' grant a parole date, and that the passage of time and the related changes in a prisoner's mental attitude and demeanor are probative of the determination of current dangerousness." (*Lawrence, supra,* 44 Cal.4th at p. 1226.)

In other words, as we have previously held, the exceedingly deferential nature of the "some evidence" standard does not convert us " 'into a potted plant.' " (*Lawrence, supra,* 44 Cal.4th at p. 1212, quoting *In re Scott* (2004) 119 Cal.App.4th 871, 898 [15 Cal.Rptr.3d 32] (*Scott I*).) We must ensure that the denial of parole is based on "some evidence" of current dangerousness. "[S]uch evidence ' "must have some indicia of reliability." ' " (*Scott I*, at p. 899.) "[T]he 'some evidence' test may be understood as meaning that suitability determinations must have some rational basis in fact." (*In re Scott* (2005) 133 Cal.App.4th 573, 590, fn. 6 [34 Cal.Rptr.3d 905] (*Scott II*).)

▬▬ In short, as Justice Moreno stated neatly in his concurring opinion in *Lawrence*: "a parole date *shall* normally be granted *except when some evidence of current dangerousness, after considering the totality of the circumstances,* justifies denial of parole." (*Lawrence, supra,* 44 Cal.4th at p. 1230 (conc. opn. of Moreno, J.), italics added.)[7]

## II. *The Governor's Reasons for Reversal*

A. *The Governor's Reliance on the Nature and Circumstances of the Murder*

With regard to the nature and circumstances of Moses's murder of Rhodes, the Governor wrote: "[T]he second degree murder for which Bennie Moses was convicted was especially atrocious because of the calculated and dispassionate manner in which it was carried out. According to the district attorney's 1980 statement, Bennie's father was shot to death in 1975 by Willie's brother, and on the day of Willie's murder, Bennie talked to his sister about 'getting even.' Bennie then entered Willie's home with a cocked gun and shot Willie from only a few inches away. Moreover, Bennie's actions demonstrated an exceptionally callous disregard for human suffering and life. He shot Willie in his own home on Thanksgiving Day, in the presence [of] friends and family, including three adults and six children. And after he shot Willie, Willie's 'common-law wife' hysterically put her hand through a window and was severely cut, and the children 'were running in all directions, screaming and yelling.' Nonetheless, as Willie left the scene, he coldly

---

[7] Justice Moreno's concurrence is particularly notable because *Lawrence* was determined by a four-to-three vote.

remarked, 'Bye,' and went out the door. Given the nature and circumstances of the offense, the gravity of this crime alone would be sufficient for me to conclude presently that Bennie would pose an unreasonable risk to public safety."

The Governor improperly relied on the nature and circumstances of Moses's crime to reverse the Board's decision for three reasons. First, his characterizations of these circumstances are not supported by "some evidence." Second, he failed to articulate a rational nexus between the circumstances and the purported present danger rather than rely on immutable factors, contrary to the requirement discussed in *Lawrence, supra*, 44 Cal.4th 1181. Third, he contended that he could rely on the "gravity of this crime alone" to conclude Moses's release posed an unreasonable risk of danger to public safety, which is incorrect; indeed, we conclude that the crime is not some evidence of present dangerousness given the circumstances of this case.

1. *The Governor's Characterizations Are Not Supported by the Evidence*

The Governor contended that Moses's murder of Rhodes was "especially atrocious" because he killed Rhodes in a "calculated and dispassionate manner" and with "exceptionally callous disregard for human life," tracking factors contained in the subject regulations. (See Regs., § 2402, subd. (c)(1)(B), (D).)[8] The record does not support these two characterizations.

a. *"Calculated and Dispassionate Manner"*

As Moses points out, the Governor's "calculated and dispassionate manner" characterization ignores a critical and undisputed fact. As the deputy district attorney stated in his 1980 letter, on the day of the murder, "defendants were driving around town, stopping in to see friends and relatives, *and drinking. Bennie Moses, in particular, consumed copious amounts of alcohol according to defense witnesses*." (Italics added.) The 1980 probation department report stated this fact as well. Rouse paid close attention to Moses's alcohol abuse in his psychological evaluation of Moses. Moses's drinking was a central topic of discussion throughout his 2007 parole consideration

---

[8] Factors supporting a finding that the inmate committed the offense in an especially heinous, atrocious, or cruel manner include the following: (A) multiple victims were attacked, injured, or killed in the same or separate incidents; (B) the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (C) the victim was abused, defiled, or mutilated during or after the offense; (D) the offense was carried out in a manner that demonstrates an exceptionally callous disregard for human suffering; and (E) the motive for the crime is inexplicable or very trivial in relation to the offense. (Regs., § 2402, subd. (c)(1); see *Lawrence, supra*, 44 Cal.4th at p. 1202, fn. 7 [summarizing Regs., § 2281, subd. (c)(1)].)

hearing, and Moses repeatedly acknowledged the role his drinking played in the crime. In short, the record indicates that Moses's "copious" consumption of alcohol played a significant role in his actions, thereby undermining the Governor's characterization of Moses as acting in a "calculated and dispassionate manner."

 Second, similarly, the Governor ignored the nature of the jury's verdict, which was to convict Moses of *second degree* murder. " 'Second degree murder is defined as the unlawful killing of a human being with malice aforethought, but without the additional elements—i.e., willfulness, premeditation, and deliberation—that would support a conviction of first degree murder.' " (*In re Vasquez* (2009) 170 Cal.App.4th 370, 383 [87 Cal.Rptr.3d 853] (*Vasquez*).) The verdict also undermines the Governor's characterization.

Third, as Moses also points out, the Governor did not explain the connection between the facts he cited and his conclusion that Moses acted in a "calculated and dispassionate" manner. To the contrary, he referred to evidence that further undermines his characterization. The Governor asserted that "Bennie's father was shot to death in 1975 by Willie's brother, and on the day of Willie's murder, Bennie talked to his sister about 'getting even.' " Moses argues that the Governor's suggested motive of revenge does not indicate that Moses acted in a "dispassionate" manner, a term which Moses, relying on the ordinary meaning of the word contained in Merriam-Webster's online dictionary, defines without objection from the Attorney General as " 'not influenced by strong feeling' or 'especially: not affected by personal or emotional involvement.' " We agree that the Governor's suggested motive, particularly when considered with Moses's copious consumption of alcohol during a day of visiting family and friends, does not support the conclusion that Moses acted in a "calculated and dispassionate" manner. To the contrary, it indicates that Moses's shooting Rhodes was a "crime of passion."[9]

b. *"Exceptionally Callous Disregard for Human Suffering and Life"*

The Governor further asserted that Moses acted with "exceptionally callous disregard for human suffering and life" because he murdered Rhodes in the

---

[9] Indeed, the Governor's apparent conclusion that Moses murdered Rhodes out of familial revenge suggests that Moses is unlikely to commit such an act again. Our literature, without sanctioning it, has long recognized the relatively unique circumstances of a child avenging the death of a father who is gone but not forgotten:
"Haste me to know't, that I, with wings as swift
"As meditation or the thoughts of love,
"May sweep to my revenge." (Shakespeare, Hamlet, act I, scene 5.)

presence of family and friends, including children, and then, with Rhodes's wife and the children in a state of hysteria, exited with a callous "Bye." This characterization also is not supported by the evidence.

In his 1980 letter, which provides the only detailed description of events contained in the record other than Moses's own account, the deputy district attorney stated that when Moses entered the home, the adults were in the kitchen and the children were in the dining room, and that Moses shot Rhodes in the living room. The deputy district attorney did not state that Moses shot Rhodes in the presence of others, although his description strongly suggests Rhodes's 13-year-old stepdaughter witnessed the shooting. Assuming this to be the case, the Governor's reasoning is still wanting. Any murder is atrocious, and Moses's murder of Rhodes in Rhodes's home, with others present in the home, was deplorable. However, and most unfortunately, we cannot conclude that it is particularly uncommon for such acts to occur in the presence of others, including on holidays, in people's homes, and with alcohol abuse involved. Furthermore, as Moses points out, "[a]ll second degree murders, by definition, involve callousness or an indifference to the feelings and suffering of others." (*Vasquez, supra*, 170 Cal.App.4th at p. 383.) Thus, viewed in the overall nature of second degree murder, we fail to see how such conduct was *exceptionally* callous. (See *id.* at p. 384 [finding the hitting and kicking of the unconscious shooting victim, who had been fighting with the murderer, was not an act done with exceptionally callous disregard for human suffering and life].)

The deputy district attorney indicated that Moses left almost immediately, saying "bye" and going out the door, but not as the Governor described. The deputy district attorney reported that, *after* Moses departed, "[w]hen the police arrived, chaos reigned" because of the injury to Rhodes's common law wife and the children's yelling and screaming. The Governor's account switched the order of these events to indicate that Moses, with exceptionally callous disregard, said "bye" and left the home in the face of this ongoing chaos. Therefore, the Governor's depiction is not supported by some evidence, which further undermines his "callous disregard" characterization.

### 2. *Lack of a Rational Nexus*

As Moses argues, the Governor failed to articulate a rational nexus between the commitment offense and a finding that Moses was currently an unreasonable risk or threat to public safety if released. This is a critical failure under *Lawrence, supra*, 44 Cal.4th 1181.

The governor's discussion of the nature and circumstances of the offense (as well as his discussion of Moses's criminal history) referred to immutable factors only. However, "the paramount consideration for both the Board and the Governor under the governing statutes is whether the inmate currently poses a threat to public safety and thus may not be released on parole." (*Lawrence, supra*, 44 Cal.4th at p. 1210.) Thus, as the *Lawrence* court explained, " '*due consideration' of the specified factors requires more than rote recitation of the relevant factors with no reasoning establishing a rational nexus between those factors and the necessary basis for the ultimate decision—the determination of current dangerousness.* 'It is well established that a policy of rejecting parole solely upon the basis of the type of offense, without individualized treatment and due consideration, deprives an inmate of due process of law.' " (*Id.* at p. 1210, italics added.)

As we discuss throughout this opinion, the Governor's analysis repeatedly amounted to little more than a "rote recitation of the relevant factors," without articulating a rational nexus between those factors and the determination of current dangerousness. (*Lawrence, supra*, 44 Cal.4th at p. 1210; see *In re Lazor* (2009) 172 Cal.App.4th 1185, 1204 [92 Cal.Rptr.3d 36] [finding the Board's "rote recitation" of immutable circumstances of the crime and petitioner's disciplinary history insufficient under *Lawrence*].) The Governor's characterization of the nature and circumstances of the crime is one example. He recited two unsuitability factors, then presented inaccurate characterizations of the crime that are unsupported by the record. Furthermore, he made no effort to articulate a rational nexus between the nature and circumstances of the crime and Moses's present dangerousness, 27 years after the fact.

The Attorney General defends the Governor's failure to address any rational nexus, arguing that courts are to look for the nexus between the evidence and the risk of current danger, and that the Supreme Court's clarification in *Lawrence, supra*, 44 Cal.4th 1181, "did not impose a new requirement on the Executive Branch." The Attorney General points to the court's decision in *Shaputis, supra*, 44 Cal.4th 1241, characterizing it as upholding the Governor's denial of parole "despite [the] absence of an articulated, explicit nexus."

We reject the Attorney General's argument for two reasons. First, *Lawrence* and *Shaputis* make clear that " 'the relevant inquiry for a reviewing court is not merely whether an inmate's crime was especially callous, or shockingly vicious or lethal, but whether the identified facts are *probative* to the central issue of *current* dangerousness when considered in light of the full record before the Board or the Governor.' " (*Shaputis, supra*, 44 Cal.4th at p. 1255, quoting *Lawrence, supra*, 44 Cal.4th at p. 1221.) Second, the Supreme Court determined *Shaputis* in light of the Governor's explicit

reliance not only on the aggravated nature of the crime, but also on Shaputis's failure to take responsibility for, and lack of insight into, his conduct towards the victim and his long history of domestic violence. (*Shaputis*, at p. 1253.) The court did not address the question of "rational nexus" at all, apparently because it found the Governor's reasons provided a sufficient articulation of such a nexus as to eliminate the issue from discussion. Such is not the case here.

### 3. *The Gravity of the Crime Is Not "Some Evidence" of Current Dangerousness*

Rather than articulate such a rational nexus, the Governor concluded that, "[g]iven the nature and circumstances of the offense, the gravity of this crime *alone* would be sufficient for me to conclude presently that Bennie would pose an unreasonable risk to public safety." (Italics added.) As Moses points out in his petition brief, *Lawrence* makes clear that, assuming Moses's crime involved aggravated circumstances, this "does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety." (*Lawrence, supra*, 44 Cal.4th at p. 1214.) As Moses also points out, and as we have previously held, otherwise such a statement simply "could be repeated . . . until [petitioner] dies or is rendered helpless by the infirmities of sickness or age." (*Scott II, supra*, 133 Cal.App.4th at p. 595, fn. 8.) The Governor's insistence that he could rely on the gravity of Moses's crime alone to establish current dangerousness is, therefore, incorrect.

Furthermore, we conclude that the gravity of the crime is not some evidence of current dangerousness under the circumstances of this case. The Supreme Court instructed in *Lawrence, supra*, 44 Cal.4th 1181, that "[w]hen . . . all of the information in a postconviction record supports the determination that the inmate is rehabilitated and no longer poses a danger to public safety, and the Governor has neither disputed the petitioner's rehabilitative gains nor, importantly, related the commitment offense to current circumstances or suggested that any further rehabilitation might change the ultimate decision that petitioner remains a danger, mere recitation of the circumstances of the commitment offense, absent articulation of a rational nexus between these facts and current dangerousness, fails to provide the

required 'modicum of evidence' of unsuitability." (*Id.* at pp. 1226–1227.)[10] We can think of few cases more appropriate to this discussion in *Lawrence* than the present case. All of the information in Moses's 27-year postconviction record supports the determination that he is rehabilitated and no longer poses an unreasonable risk of danger to public safety. The Governor did not dispute these gains in his decision. Instead, as we have indicated, despite his rote recitation of some suitability factors, he simply ignored them in his analysis. The reasons the Governor relied on to characterize the crime as "especially atrocious" were not supported by some evidence, and he did not relate any of them to current circumstances, nor did he suggest that further rehabilitation might change his ultimate decision that Moses remains a danger. Under these circumstances, we conclude the gravity of the crime is not some evidence of current dangerousness.

B. *The Governor's Reliance on Moses's Version of Events*

The Governor also reversed the Board's grant of parole because he could not accept Moses's purportedly continuing claim that he acted in self-defense when he shot Rhodes.[11] The Governor stated: "Although Bennie says he accepts responsibility for his actions and is remorseful, he maintains that he shot Willie in self defense. Bennie told the 2007 Board that he and his brother were driving to his aunt's house when his brother needed to stop and use the restroom. Although Bennie's aunt only lived 'a few blocks down from Willie,' Bennie stopped at Willie's house. Bennie claimed that he did not hold a grudge against Willie and that he entered the home to talk with Willie. At some point, according to the 2007 mental-health evaluation, Bennie said he and Willie argued and Willie reached for a gun. Bennie told the 2007 Board that he pulled his gun out and shot Willie. At Bennie's 2007 hearing, the deputy district attorney pointed out that his story 'seem[ed] a little too coincidental . . . ,' and considering the evidence that Bennie entered Willie's home with his gun drawn and cocked, and he shot Willie from a few inches away, I do not accept Bennie Moses's version of events."

---

[10] This same analysis applies the Governor's analysis of Moses's criminal history and his reference to discrepancies between Moses's version of events and other evidence. "Although couched as an evidentiary standard, [this] holding is more akin to a procedural requirement to allow meaningful judicial review. As such, it logically extends to all facts upon which the Governor relied to deny parole." (*In re Ross, supra,* 170 Cal.App.4th at p. 1513, fn. 3.)

[11] Moses argues that we must grant his petition because of the Governor's reliance on the immutable factors regarding the crime and his criminal history, particularly because of the Governor's having done so for the third time to reverse a Board's grant of parole. However, the Governor did not rely *solely* on such immutable factors in any of his three decisions to reverse the Board. In the Governor's present decision, he provided this third reason for his reversal, his inability to accept Moses's version of events.

As the Supreme Court made clear in *Shaputis, supra*, 44 Cal.4th 1241, an inmate's failure to gain insight into his antisocial behavior despite years of therapy and rehabilitative programming, when considered with evidence of the inmate's history of violence and recent psychological reports reflecting that the inmate's character remains unchanged, can provide "some evidence" for the conclusion that the inmate remains dangerous and is unsuitable for parole. (*Id.* at p. 1260.) This holding, however, does not permit the Governor to rely on his "self-defense" analysis for two reasons. First, there is no evidence that Moses maintained that he acted in self-defense as of the July 2007 Board hearing. Second, to the extent the Governor relied on discrepancies between Moses's version of events and other evidence, the Governor failed to articulate any rational nexus between these discrepancies and current dangerousness, and they are not "some evidence" of such dangerousness under the circumstances of this case.

### 1. *Self-defense*

We agree with Moses that there is no evidence that he continued to maintain that he "shot [Rhodes] in self defense." Moses did not refer to self-defense at the 2007 Board hearing, stating only that he shot Rhodes after they argued, when Rhodes, who was "not a good person," "reach[ed] in his pocket." The Governor correctly noted that Rouse reported that Moses told him that "[Rhodes] reached into his pocket for a gun, and that's when it happened." However, Rouse did not report that Moses claimed he acted in self-defense.

In fact, the Governor necessarily disregarded ample, undisputed evidence that directly contradicted his contention that Moses maintained a self-defense claim. Specifically, any such implication in Rouse's report was directly and fatally undermined *by Rouse in the very same paragraph*, wherein he reported that Moses "*took full and complete responsibility for his commitment offense* in a genuine non-defensive or minimizing manner." (Italics added.) The Governor also ignored that in the 2007 hearing, Moses stated that he had participated in VORG for many years, and that in order to participate, "you have to admit to your crime. And I've been in there ever since '90," and the undisputed evidence that Moses's remorse was long-standing, as indicated by Wagner's statement in his 2002 psychological evaluation that Moses "thinks about the crime nearly every day and expressed sincere sorrow for the crime." In other words, there is ample evidence in the record, undisputed by the Governor, that Moses has repeatedly and consistently acknowledged, fully and completely, that he murdered Rhodes. As we stated in *In re Elkins* (2006) 144 Cal.App.4th 475 [50 Cal.Rptr.3d 503], "acceptance of responsibility works in favor of release '[n]o matter how

longstanding or recent it is,' so long as the inmate 'genuinely accepts responsibility . . . .' " (*Id.* at p. 495 [finding there was "no rational support for the astounding conclusion" that the petitioner's decade-long acceptance of responsibility did not even weigh in favor of his parole].) In any event, this evidence of taking responsibility and expressing remorse contradicts the Governor's claim that Moses maintained he acted in self-defense.

■■■ The Governor cannot simply ignore the undisputed evidence of Moses's taking of responsibility and repeated expressing of remorse. While the Governor is not required to specify in detail every pertinent fact that he considered (*In re Elkins, supra,* 144 Cal.App.4th at p. 492, fn. 4), he *is* obligated to consider the totality of the circumstances involved, including all suitability factors, which include "signs of remorse" and institutional activities that indicated "an enhanced ability to function within the law upon release." (Regs., § 2402, subd. (d)(3), (9); see *Lawrence, supra,* 44 Cal.4th at p. 1230 (conc. opn. of Moreno, J.); *Scott I, supra,* 119 Cal.App.4th at p. 898 ["evidence of circumstances tending to show suitability for release was ignored . . ." by the Board]; *Scott II, supra,* 133 Cal.App.4th at p. 590 [holding that, based on *Rosenkrantz, supra,* 29 Cal.4th at p. 677, the Governor's decision must reflect an individualized consideration of the specified criteria and cannot be arbitrary and capricious].) His discussion of Moses's version of events indicates that, despite his rote recitations of suitability factors and brief reference to Moses's remorse and taking of responsibility, he did not do so.[12]

The Attorney General argues that the Supreme Court's instruction in *Lawrence, supra,* 44 Cal.4th 1181, and *Shaputis, supra,* 44 Cal.4th 1241, does not necessarily mean that we can "infer that the Governor did not consider a particular piece of evidence simply because he did not mention that evidence." The Attorney General relies on *In re McClendon* (2003) 113 Cal.App.4th 315 [6 Cal.Rptr.3d 278], in which the petitioner complained that the Governor's written parole decision did not discuss the factors favoring the petitioner's release. (*Id.* at p. 323.) The court, after noting a disagreement among the appellate courts, chose the approach taken in *In re Morrall* (2002) 102 Cal.App.4th 280, 299–300 [125 Cal.Rptr.2d 391], and determined that it could not infer that the Governor failed in his duty to consider all relevant, reliable information in determining suitability for parole because he did not

---

[12] As Moses also argues, the Governor, while he referred to Moses's age, did not give any indication that he considered Moses's advancing age, although another specified suitability factor is that "[t]he prisoner's present age reduces the probability of recidivism." (Regs., § 2402, subd. (d)(7).) Moses also argues that the Governor failed to consider the "stress" caused by Moses's heavy drinking. (*Id.,* subd. (d)(4).) We have already referred to the Governor's failure to consider Moses's heavy drinking.

discuss each factor. The *McClendon* court also relied on the general presumption contained in Evidence Code section 664 "that official duty has been regularly performed." (*McClendon,* at p. 323.)

We reject the Attorney General's argument. We need not determine whether or not we agree with the analysis in *In re McClendon, supra,* 113 Cal.App.4th 315, because we do not fault the Governor for a failure to make a *detailed* analysis of every suitability factor, but for his evident failure to give due consideration to all of the factors, including Moses's undisputed taking of responsibility and expressions of sincere remorse, or to relate any of the factors to an evaluation of current dangerousness. Assuming for the sake of argument that we might be required to afford some presumption to the Governor regarding his consideration of suitability and unsuitability factors, such a presumption could not be maintained here in light of the Governor's flawed analysis.

The Governor's analysis regarding Moses's version of events is very similar to his approach in *Vasquez, supra,* 170 Cal.App.4th 370, in which he asserted that Vasquez " 'claims to accept responsibility and be remorseful for his actions, yet maintains, including most recently at his 2006 hearing, that he acted in self-defense.' " (*Id.* at p. 385.) The *Vasquez* court, finding both that Vasquez did not actually claim self-defense and showed uncontradicted signs of remorse, rejected the Governor's argument as not supported by some evidence of current dangerousness. (*Id.* at pp. 385–386; see also *In re Rico* (2009) 171 Cal.App.4th 659, 678 [89 Cal.Rptr.3d 866] [rejecting the argument that petitioner did not show insight or remorse because the Board "did not mention any purported lack of insight or remorse as a factor supporting its unsuitability finding"].) We reach the same conclusion as the *Vasquez* court. The Governor's claim that Moses maintained he acted in self-defense is not supported by the record and, therefore, does not provide "some evidence" of current dangerousness.

2. *Discrepancies*

Second, to the extent the Governor relied on discrepancies between Moses's version of events and other evidence, the Governor also failed to articulate any rational nexus between these discrepancies and any current dangerousness. We conclude that there is not some evidence of such a nexus in light of the circumstances of this case.

As the Governor indicated in his decision, Moses recalled stopping at Rhodes's home because his brother needed to use the restroom, and that he entered Rhodes's home with his gun in his waist and shot Rhodes in the midst of an argument when Rhodes reached in his pocket. However, there

was evidence that the pair were within a couple of blocks of their aunt's house when they stopped, that Rhodes's stepdaughter saw Moses enter the home with his gun drawn, and that Moses shot Rhodes at close range.

The Governor does not articulate a rational nexus between these discrepancies and present dangerousness, and we fail to see such a connection, particularly in light Moses's taking responsibility for the commitment offense and his exemplary prison record. The discrepancies are very similar to those discussed in *In re Palermo* (2009) 171 Cal.App.4th 1096 [90 Cal.Rptr.3d 101], in which the Third Appellate District granted relief to a habeas corpus petitioner who challenged the Board's denial of parole, which denial was in part because the petitioner had continued to insist that he had accidentally shot his girlfriend with his gun. (*Id.* at pp. 1110–1111.) The appellate court concluded that "defendant's version of the shooting of the victim was not physically impossible and did not strain credulity such that his denial of an intentional killing was delusional, dishonest, or irrational. And . . . defendant accepted 'full responsibility' for his crime and expressed complete remorse; he participated effectively in rehabilitative programs while in prison; and the psychologists who evaluated him opined that he did not represent a risk of danger to the public if released on parole. Under these circumstances, his continuing insistence that the killing was the unintentional result of his foolish conduct (a claim which is not necessarily inconsistent with the evidence) does *not* support the Board's finding that he remains a danger to public safety." (*Id.* at p. 1112.)

 Moreover, the Fourth Appellate District, relying also on *Lawrence*, recently stated that "the mere existence of facts suggesting the crime involved some level of premeditation does not necessarily constitute evidence that releasing [defendant] on parole would unreasonably endanger public safety." (*Vasquez, supra,* 170 Cal.App.4th at p. 384.)

Here, Moses's recollection of events, to the extent it differed from other evidence, is insignificant in light of his acknowledgment that he murdered Rhodes and repeated expressions of remorse, his extensive drinking on the day in question, which could have affected his perceptions, his denunciation of drinking and guns, his long-standing participation in prison in self-help programs such as AA and VORG, his exemplary disciplinary and work record in prison, and the multiple positive psychological evaluations that we have discussed herein. Therefore, we conclude these discrepancies are not some evidence of present dangerousness.[13] (*Lawrence, supra,* 44 Cal.4th at pp. 1226–1227.)

---

[13] Despite our considerable respect for the superior court's evaluation of the Governor's decision, we reject its characterization, also maintained by the Attorney General and apparently conceded to by Moses, of the Governor's discussion as indicating that the Governor relied on Moses's lack of insight or questionable remorse to reverse the Board's decision. The Governor

## C. The Governor's Reliance on Moses's Criminal History

The Governor also based his decision to reverse the Board's grant of parole on Moses's "significant record of criminal violence." The Governor stated: "In addition, Mr. Moses was 30 years old at the time of the murder, and he had a significant record of criminal violence. At age 15, Mr. Moses was adjudicated for assault, and he was committed to the California Youth Authority (CYA). And as an adult, he was convicted for assault with a deadly weapon. He was recommitted to the CYA. Mr. Moses's record of escalating criminal violence, which includes an incident of violence at a young age, weighs against his parole suitability at this time."

We agree with the superior court that this finding also is not supported by the evidence. Under the pertinent regulations, the fact that a prisoner has a previous record of violence, such as the previous infliction of serious injury to a victim or a demonstration of serious assaultive behavior at an early age, are factors which tend to show that a prisoner is unsuitable for parole. (Regs., § 2402, subd. (c)(2).) On the other hand, when a prisoner "lacks any significant history of violent crime," this tends to show that the prisoner is suitable for parole. (*Id.*, subd. (d)(6).) Therefore, past criminal history is relevant to the determination of a prisoner's suitability for parole. (*Id.*, subd. (b).)

Thus, it is within the Governor's discretion to consider Moses's past acts of violence as a juvenile and as an adult.[14] We do not mean to suggest that Moses was not involved in any such acts. However, the Governor's reference to Moses's history of criminal violence as "significant" cannot be maintained based upon one juvenile incident and one adult crime in the 15 years prior to the murder, the adult crime occurring approximately 11 years before, when

did not expressly refer to Moses's lack of insight or lack of remorse. We "should not infer factors that the Governor might have relied upon." (*Vasquez, supra,* 170 Cal.App.4th at p. 385, citing *In re Roderick* (2007) 154 Cal.App.4th 242, 265 [65 Cal.Rptr.3d 16]; see *In re DeLuna* (2005) 126 Cal.App.4th 585, 593–594 [24 Cal.Rptr.3d 643].) We agree with the *Roderick* court, which stated in discussing a Board decision that, "[g]iven the extraordinarily deferential standard of review we already apply . . . , it would be inappropriate for courts to salvage the . . . inadequate findings by inferring factors that might have been relied upon. . . . Accordingly, '[w]e must confine our review to the stated factors . . . and all the evidence presented . . . which is relevant to those findings, not to findings that the Attorney General . . . suggests . . . might have [been] made.'" (*Roderick,* at p. 265.) However, as our discussion herein indicates, even if the Governor relied on a purported lack of insight, his conclusion is not supported by some evidence.

[14] Petitioner characterizes his second incident as a juvenile offense. However, the 1980 probation department report refers to FBI records indicating that Moses had a "conviction" for violations of Penal Code section 211 and former section 217, and the destruction of his "juvenile and adult probation folders." Therefore, some evidence supports the Governor's characterization of this incident as an adult criminal conviction.

Moses was still in his teens. To hold otherwise would be to indicate that almost any history of criminal violence was "significant."

Moses also argues in his petition brief that it was "unreasonable to conclude" that Moses's history sets forth an " 'escalating pattern of criminal conduct,' " that the Governor ignores Moses's 30 years of exemplary behavior in prison, and that there is no evidence to support the Governor's reliance on Moses's offenses as establishing some evidence of current dangerousness. Moses's argument is premised on a mischaracterization of the Governor's analysis, which refers only to a "record of escalating criminal violence." Arguably, the record supports the Governor's characterization of Moses's preconviction history, given that Moses first committed assault, then assault with a deadly weapon, and then murder. However, once again, the Governor did not articulate any rational nexus between this history and Moses's purported current dangerousness. (See *Lawrence, supra,* 44 Cal.4th at p. 1212.) The Governor cannot describe such a nexus based on two incidents that occurred nearly 40 years or more before his decision. We conclude that this criminal history is not, on its face, pertinent evidence of current dangerousness. (*Id.* at pp. 1226–1227.)

To summarize, the Governor's three reasons for reversal of the Board's grant of parole are not supported by "some evidence," amount to little more than the "rote recitation" of factors, and indicate a lack of individualized consideration for Moses's case. The Governor did not articulate any rational nexus between any of his reasons and Moses's purported current dangerousness. Indeed, none of the Governor's reasons are based on evidence of current dangerousness. This is particularly striking in light of Moses's exemplary postconviction behavior and his repeated expressions of remorse.

██ We remain mindful of our deferential standard of review. Nonetheless, *Lawrence* makes clear that our "judicial review must be sufficiently robust to reveal and remedy any evident deprivation of constitutional rights. If simply pointing to the existence of an unsuitability factor and then acknowledging the existence of suitability factors were sufficient to establish that a parole decision was not arbitrary, and that it was supported by 'some evidence,' a reviewing court would be forced to affirm any denial-of-parole decision linked to the mere existence of certain facts in the record, even if those facts have no bearing on the paramount statutory inquiry. Such a standard, because it would leave potentially arbitrary decisions of the Board or the Governor intact, would be incompatible with our recognition that an inmate's right to due process 'cannot exist in any practical sense without a remedy against its abrogation.' [Citations.] [¶] . . . [¶] ██ Accordingly,

when a court reviews a decision of the Board or the Governor, the relevant inquiry is whether some evidence supports the *decision* of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings." (*Lawrence, supra*, 44 Cal.4th at pp. 1211–1212.) In accordance with this instruction, we conclude that the Governor's decision violated Moses's due process rights and that his petition should be granted.

## D. *Remedy*

There remains the question of remedy. Moses argues that, if we grant his petition, due process demands his immediate release from state custody. The Attorney General argues that in such a circumstance, we should remand the matter to the Governor. We conclude that Moses is entitled to reinstatement of the Board's July 2007 grant of parole without remand of the matter to the Governor.

Moses argues that we should afford him the relief provided by the Fourth Appellate District in *Vasquez, supra*, 170 Cal.App.4th 370. The *Vasquez* court rejected the Attorney General's suggestion of remand because the court's review indicated "that the record does not contain some evidence to support the Governor's decision and further consideration by the Governor will not change that fact." (*Id.* at p. 386.) Moses also notes that in *Lawrence*, the Court of Appeal had reinstated the Board's grant of parole, and petitioner was released on parole during the subsequent litigation. (*Lawrence, supra*, 44 Cal.4th at p. 1201.) The *Lawrence* court subsequently declined to issue a writ of supersedeas to stay the order of release as requested by the Attorney General. (*Ibid.*) Finally, Moses argues that there is "no reasonable, reliable evidence" to support any of the Governor's reasons for his decision, and argues that remand to the Governor would be futile because the record does not contain "some evidence" to support his decision.

Moses also finds support for his position in *In re Masoner* (2009) 179 Cal.App.4th 1531 [102 Cal.Rptr.3d 463], in which the appellate court held that the superior court, upon vacating the Governor's reversal of the Board's grant of parole, had the authority to reinstate the Board's decision without remanding the matter to the Governor. The appellate court held that doing so did not improperly divest the Governor of his right to review the parole decision because he had already done so, and there was no evidence to support his reversal. (*Id.* at pp. 1537–1538.) It noted that if courts were required to remand to the Governor even in the absence of such evidence, "a prisoner's due process rights and the writ of habeas corpus would be

meaningless . . . because the Governor could arbitrarily detain a prisoner indefinitely, without evidence of the prisoner's current dangerousness and in violation of California law, and the courts would have no practical power to grant the prisoner relief." (*Id.* at p. 1540.) The court also rejected the argument that the failure to remand to the Governor violated the separation of powers doctrine. (*Id.* at p. 1538.)

The Attorney General argues that the only process due is an appropriate review by the Governor and, to the extent the Governor failed to provide this, remand should occur. The Attorney General notes that the Supreme Court, in *Rosenkrantz, supra*, 29 Cal.4th 616, stated that if some evidence did not support a Board denial, the reviewing court should grant the petition and order the Board to vacate its decision and proceed according to due process of law (*id.* at p. 658), and that this same standard should apply to the Governor. The Attorney General also cites *In re Capistran* (2003) 107 Cal.App.4th 1299, 1306–1307 [132 Cal.Rptr.2d 872], in which the court granted the petition brought because of the Governor's failure to give individualized consideration to all the suitability factors and, pursuant to *Rosenkrantz*, remanded the matter to the Governor to proceed in accordance with due process.

Also, at the hearing for this appeal, the Attorney General urged that we follow the disposition of *In re Ross, supra*, 170 Cal.App.4th 1490, in which the appellate court found that the Governor's written, pre-*Lawrence* decision reversing a parole board's grant of parole was flawed because it did not contain a more explicit articulation of a rational nexus between the facts cited and Ross's current dangerousness. (*Ross*, at pp. 1496–1497.) Rather than release Ross, the appellate court remanded the matter back to the Governor to make more specific findings in light of *Lawrence*, and because the court could not determine how much the Governor had relied on certain troubling mental state evidence. (*Ross*, at pp. 1513–1515.) However, the Attorney General did not argue, and we do not find, that there is equivalent troubling evidence in the record before us.

We agree with Moses that remand to the Governor would be inappropriate under the circumstances. As we have discussed, there is not "some evidence" in the record to support the Governor's contentions of current dangerousness, and we conclude that "further consideration by the Governor will not change this fact." (*Vasquez, supra*, 170 Cal.App.4th at p. 386.) Accordingly, Moses is entitled to reinstatement of the Board's July 2007 grant of parole without remand to the Governor for his further consideration of it. (*Ibid.*; *In re Masoner, supra*, 179 Cal.App.4th 1531.)

## DISPOSITION

The petition for writ of habeas corpus is granted. The Governor is hereby ordered to vacate his decision of June 23, 2008, which reversed the Board's July 2007 grant of parole. The Board's July 2007 grant of parole is reinstated.[15] In the interests of justice, this opinion is made final as to this court seven days from the date of filing. (Cal. Rules of Court, rule 8.387(b)(3)(A).)

Kline, P. J., and Richman, J., concurred.

---

[15] Of course, the Board retains its power to rescind that parole on an appropriate record based on events occurring after its 2007 suitability determination. (*In re Powell* (1988) 45 Cal.3d 894, 901–902 [248 Cal.Rptr. 431, 755 P.2d 881]; Pen. Code, §§ 3041.5, 3041.7; Regs., § 2450.)